[No. 11427.   Department Two.   November 1, 1913.]

EDWARD CUDIHEE, *Appellant,* v. BYRON PHELPS, *as Auditor of King County et al., Respondents.*[1]

STATUTES—TITLES AND SUBJECTS—SCOPE. The title to the act of 1911, Laws 1911, p. 504, submitting a constitutional amendment for the recall of elective officers, is not defective or misleading because broader than the act, in that the title refers to all public officers and to the election of their successors; while the proposed amendment in the body of the act excepts judges and makes no provision for the election of successors; the title being sufficient if it indicates to a person of ordinary intelligence the substance and scope of the act.

SAME—SINGLE OBJECT. Such act is not subject to the objection that it embraces more than one subject, since the recall of an officer and the election of his successor do not relate to separate subject-matters.

CONSTITUTIONAL LAW—AMENDMENTS—PROPOSAL — PASSAGE — REQUISITES—"ENTRY." Const., art. 23, § 1, requiring that amendments to the constitution proposed by the legislature shall be agreed to by two-thirds of the members elected to each of the two houses and "entered on their journals" does not require the copying of the entire proposed amendment in the journals of the Senate and House, but is complied with by a memorandum entry by reference to the proposal, using the language of the title of the act.

CONSTITUTIONAL LAW—AMENDMENTS — ELECTION—PUBLICATION OF NOTICE—VALIDITY. Laws of 1911, p. 505, § 2, submitting a proposed amendment to the constitution, and which required the secretary of state to publish notice of the submission for "three weeks next preceding the election," must be held to have intended to submit the amendments in the manner required by the constitution, art. 23, § 1, by a publication for "three months;" and where the secretary of state published the notice for three months as required by the constitution, the election is not invalidated by the fact that the law directed publication for but three weeks.

SAME—BALLOTS—REFERENCES TO PROPOSITIONS. The statement upon a ballot of a proposed constitutional amendment need not be more than a reference in very general terms to the proposed amendment, and is sufficient if, as required of the title of an act of the legislature, it directs the mind of a person of ordinary intelligence to the amendment to be voted upon.

[1]Reported in 136 Pac. 367.

Officers—Elective Officers—Recall—Statutory and Constitu-
tional Provisions—Charges—Trial. Laws of 1913, p. 454 (3 Rem.
& Bal. Code, § 4940-1 et seq.), intended to provide for the recall of
elective officers, as required by the constitutional amendment, art. 1,
§§ 33 and 34, is not defective in carrying out the provisions of the
amendment, in that while the amendment provides for a recall upon
the filing of charges against an officer, the law fails to make any
provision for determining the truth of the charges upon which the
officer is to be recalled; since that is matter triable before the people
rather than the courts, and the constitutional amendment does not
give any right to a judicial hearing upon the charges.

Same—Recall—Statutes—Retroactive Laws—Remedies. Laws
1913, p. 454 (3 Rem. & Bal. Code, §4940-1 et seq.), providing the
method of procedure for recalling elective officers, pursuant to the
constitutional amendment adopted at the general election in No-
vember, 1912, is remedial and retroactive in effect, to the extent
that it authorizes the recall of an officer elected in November, 1912,
for subsequent official misconduct committed, however, prior to the
taking effect of the law in June, 1913.

Appeal from a judgment of the superior court for King
county, Albertson, J., entered July 28, 1913, dismissing upon
the pleadings and stipulated facts, an action to enjoin a recall
election. Affirmed.

*Walter S. Fulton* (*William H. White*, of counsel), for ap-
pellant.

*John F. Murphy* and *Samuel Morrison,* for respondent
Phelps.

*Brady & Rummens* (*Glenn Hoover*, of counsel), for re-
spondent Young.

Parker, J.—The plaintiff, Edward Cudihee, sheriff of
King county, commenced this action in the superior court for
that county, seeking to have the defendant, Byron Phelps,
as county auditor, enjoined from taking any action upon a
petition filed in his office by the defendant, John M. Young,
a citizen and voter of King county, demanding the recall and
discharge of Edward Cudihee as sheriff, under the provisions
of §§ 33 and 34 of art. 1 of the state constitution, and chapter
146 of the Laws of 1913, page 454 (3 Rem. & Bal. Code,

§ 4940-1 *et seq.*), enacted in pursuance thereof. The case proceeded to final hearing upon the pleadings and stipulated facts, resulting in judgment denying the relief prayed for, and a dismissal, from which the plaintiff has appealed to this court. We shall notice the facts as may become necessary in the discussion of the several contentions made by counsel for appellant.

The main contentions of counsel for appellant have to do with the adoption of §§ 33 and 34, art. 1, as an amendment to the state constitution at the general election of 1912, and their claim that those sections never became a valid portion of the constitution. It is first contended that the act of the legislature, chapter 108, Laws of 1911, page 504, proposing and submitting this amendment to the people, is void and ineffectual because of its insufficient and misleading title. The title and body of that act, in so far as we need notice them in this connection, read:

"An act to amend article one (1) of the Constitution of the State of Washington, authorizing and empowering the voters to call a special election at any time to recall and discharge any elective public officer and to elect his successor, by adding thereto at the end of said article one (1) two new sections which shall be numbered sections 33 and 34 of said article one (1).

"*Be it enacted by the Legislature of the State of Washington:*

"Section 1. That at the general election to be held in this state on the Tuesday next succeeding the first Monday in November, 1912, there shall be submitted to the qualified electors of the state, for their adoption and approval or rejection, an amendment of article one (1) of the constitution of the state of Washington, authorizing and empowering the voters to call a special election at any time to recall and discharge any elective public officer and to elect his successor, by adding thereto at the end of said article sections 33 and 34 of said article one (1), and which shall read, as follows:

"Article I.

"Section 33. Every elective public officer in the State of Washington except judges of courts of record is subject to

recall and discharge by the legal voters of the state, or of the political subdivision of the state, from which he was elected whenever a petition demanding his recall, reciting that such officer has committed some act or acts of malfeasance or misfeasance while in office, or who has violated his oath of office, stating the matters complained of, signed by the percentages of the qualified electors thereof hereinafter provided, the percentage required to be computed from the total number of votes cast for all candidates for his said office to which he was elected at the preceding election, is filed with the officer with whom a petition for nomination, or certificate for nomination, to such office must be filed under the laws of this state, and the same officer shall call a special election as provided by the general election laws of this state, and the result determined as therein provided.

"Section 34. The legislature shall pass the necessary laws to carry out the provisions of section thirty-three (33) of this article, and to facilitate its operation and effect without delay: *Provided,* That the authority hereby conferred upon the legislature shall not be construed to grant to the legislature any exclusive power of lawmaking nor in any way limit the initiative and referendum powers reserved by the people. The percentages required shall be, state officers, other than judges, senators and representatives, city officers of cities of the first class, school district boards in cities of the first class; county officers of counties of the first, second and third classes, twenty-five per cent. Officers of all other political subdivisions, cities, towns, townships, precincts and school districts not herein mentioned, and state senators and representatives, thirty-five per cent."

We shall assume, for argument's sake only, that, when the legislature proposes and submits to the people a constitutional amendment by bill instead of by resolution, the title of such bill must conform to the requirements of § 19, art. 2 of the constitution, providing that: "No bill shall embrace more than one subject, and that shall be expressed in the title." A comparison of the title with the body of the act will readily show that, instead of the title being narrower than the body of the act, it is, in fact, broader, in that it seems to refer to all public officers, and to the election of successors, while the pro-

posed amendment set forth in the body of the act excepts
judges therefrom, and makes no provision relative to the
election of successors. That the title expresses the entire sub-
ject-matter of the body of the act and proposed amendment,
if we treat the broader terms of the title merely as surplus-
age, seems to us quite plain. The argument of counsel seems
to be that, because of its broader expressions, the title is mis-
leading. We are not able to agree with this contention. The
view of this court as to the sufficiency of the title of an act is
tersely stated by Judge Fullerton, speaking for the court, in
*Shortall v. Puget Sound Bridge & Dredging Co.*, 45 Wash.
290, 88 Pac. 212, 122 Am. St. 899, as follows:

"This court has uniformly held that the title need not be an
index of the act, but is sufficient if it so indicates its substance
and scope as to put a person of ordinary intelligence upon
notice and inquiry as to its provisions."

See, also, *State ex rel. Wolfe v. Parmenter*, 50 Wash. 164,
96 Pac. 1047, 19 L. R. A. (N. S.) 707; *State ex rel. Zent v.
Nichols*, 50 Wash. 508, 97 Pac. 728; *National Surety Co. v.
Bratnober Lumber Co.*, 67 Wash. 601, 122 Pac. 337. Clearly
this title would give to a person of ordinary intelligence notice
that the proposed amendment related to the recall of officers.
We do not think that the fact that the title seems to indicate
that the proposed amendment relates to the recall of all offi-
cers, without exception, and to the election of successors, less-
ens the force of the fact that the title clearly covers the whole
subject-matter of the proposed amendment and fairly gives
notice thereof. Nor do we think that the title is subject to
the objection that it embraces more than one subject, assum-
ing that such objection would be available against the title,
apart from such objection to the body of the act. Surely
the recall and discharge of an officer, and the choosing of his
successor can be legislated upon as one subject in a single
act; and, of course, exceptions of certain persons or things
from the operation of the effect of a law would not relate to
a separate subject-matter. The supreme court of Missouri,

in *State ex rel. Wolfe v. Bronson*, 115 Mo. 271, 21 S. W. 1125, dealing with a title which was broader in its terms than the act, disposing of the contention that the title was insufficient in the light of a constitutional amendment in substance the same as ours, said:

"Now the precise point of objection here is, not that this act contains more than one subject, but that the subject is not clearly expressed in the title in this, that the title indicates a law relating to *all* the public schools in the state, while the act itself excludes from its operation cities and districts having more. than one hundred thousand inhabitants. In other words, the objection is that the title is broader than the act itself. The constitution does not say that the title shall be as narrow as the act. What it says on this point is, that the single subject shall be clearly expressed in the title. The fact therefore that the title is broader than the act can be no objection, unless the title is comprehensive enough to admit of disconnected and incongruous subjects. Says Cooley: 'The generality of a title is therefore no objection to it, so long as it is not made a cover to legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection.' Cooley on Constitution Limitations (6 ed.) 172. The fact that the title speaks of 'all the public schools within this state,' while the proviso to section 11 excludes from the operation of the act cities and districts having more than one hundred thousand inhabitants, does not make the law unconstitutional."

This is quite in keeping with the views of this court expressed in former decisions touching the sufficiency of titles to acts, and also finds support in the following authorities: *State ex rel. Bell v. Frazier*, 36 Ore. 178, 59 Pac. 5; *Abeel v. Clark*, 84 Cal. 226, 24 Pac. 383; *McEldowney v. Wyatt*, 44 W. Va. 711, 30 S. E. 239, 45 L. R. A. 609, 615; 1 Lewis' Sutherland, Statutory Construction (2d ed.), § 124. We are of the opinion that the title to the act proposing and submitting to the people this constitutional amendment sufficiently expresses the subject-matter of the act and the proposed amendment. We have preferred to deal with the question of the sufficiency of the title to the act rather than with the ques-

tion of the necessity of a title thereto, because of the manner in which the record entry of the act appears in the senate and house journals.

It is contended that there was not made upon the journals of the senate and house such entry or record of the proposal of this constitutional amendment as is required by the constitution, and that, therefore, it was not legally proposed and submitted to the people. The proposal of amendments to the constitution by the legislature and the making of record thereof is provided for therein by art. 23, § 1, as follows:

"Any amendment or amendments to this constitution may be proposed in either branch of the legislature; and if the same shall be agreed to by two-thirds of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the ayes and noes thereon, and be submitted to the qualified electors of the state for their approval, at the next general election; and if the people approve and ratify such amendment or amendments, by a majority of the electors voting thereon, the same shall become part of this constitution."

The amendment to the constitution proposed by this act was not recorded in full in the senate journal. The bill for the act was introduced in the house and designated as "House Bill No. 62." After its passage by the house, it went to the senate. It was there read three times in due course, and passed by the requisite majority, the vote thereon by "ayes" and "noes" being properly recorded in the journal, reference to the bill being therein made as "House Bill No. 62," followed by its title recorded in full. Reference to the bill was made in this manner in the journal upon its first and second readings, as well as upon its third reading and final passage. Our attention is here called only to the senate journal entries, the argument of counsel assuming that the house journal entries were made in the same manner. This, it is insisted, was not such entry of the proposed amendment upon journals of the senate and house as is required by art. 23, § 1, of the constitution above quoted. It is argued that the words "shall

be entered on their journals," constitutes a mandatory requirement that the proposed amendment shall be recorded in full upon the journals, and that a reference to such an amendment, even though proposed in the form of a bill with a proper title as such, by its number and title set out in full, is not an entering upon the journals within the meaning of this constitutional requirement.

It is apparent, then, that this branch of the case turns upon the meaning of the word "enter" or "entered," as used in § 1 of art. 23 of the constitution. The decisions are not in harmony upon this question. Some hold that such a constitutional provision is complied with by a memoranda entry made upon the journals by reference to the proposal, using the language of the title of the proposing act or resolution, or other appropriate language if the proposal be by resolution without a title; while others hold that such a constitutional provision is complied with only by a copying of the entire proposed amendment in the journals of the senate and house. The supreme court of California, in the case of *Oakland Paving Co. v. Tompkins*, 72 Cal. 5, 12 Pac. 801, 1 Am. St. 17, reached the former conclusion, and, we think, correctly. Justice Temple, speaking for the court in that case, said:

"The only question submitted is, whether the constitutional amendment No. 1, ratified by the electors at the general election in 1884, being an amendment to section 19, article 11, was proposed by the legislature as required by section 1, article 18, of the constitution. That section provides that amendments may 'be proposed in the senate and assembly, and if two thirds of all the members elected to each of the two houses shall vote in favor thereof, such proposed amendment or amendments shall be entered in the journals, with the yeas and nays taken thereon,' etc.

"The objection is, that the proposed amendment was not entered in the journal of either house, as required by the constitution.

"It was not copied into the journal, but there was entered an identifying reference, such as is always entered in regard

11—76 WASH.

to legislative bills; that is, it was proposed as a senate bill and was referred to by title and number. The yeas and nays were entered as directed. It is agreed that the amendment thus proposed was submitted to the people, and received a very large majority of the votes cast . . . All admit that the constitutional requirement must be strictly performed. But it does not follow from this that the language of the instrument must be understood literally. The same rules of construction must be applied, to ascertain what its requirements are, as though it were not mandatory and prohibitory. And we think, when an act commanded or authorized may be done in different ways, either of which would be a strict compliance with the terms of the instrument understood in some common and popular sense, either mode may be pursued, unless some reason is discoverable for holding that one of such modes only will answer. If, for instance, the direction to enter the amendment in the journal is complied with, in some usual and popular sense of the language, either by copying the amendment into the journal or by placing upon the journal an identifying reference only, either will do unless the context shows a different intention.

"Now, the word 'enter' primarily means to go in, or to come in, but has many derivative meanings, and is often employed in elliptical expressions, and is quite apt to be so used that the literal or most obvious meaning cannot be attributed to it. We read, for instance, in the laws of Congress that citizens may enter at the landoffice a tract of land, and the expression is repeated in different forms many times. We are often told that a certain horse has been entered for a race, or an animal has been entered at a fair. What is really done in each instance is to make a record of certain important facts for preservation or notice. And such is certainly a very ordinary meaning of the word 'enter' when used in this derivative sense; that is, to register the essential facts concerning the thing said to be entered. And we think it may be fully admitted that the most natural and obvious meaning of the word when employed in this derivative sense is to copy, without greatly affecting the argument.

"We find near the title-page of nearly every book printed that it has been *entered* in the office of the librarian of Congress. What is really left with the librarian is the title-page of the proposed book, and this constitutes the entry, although

after it is printed the author is now required to present a copy of the book for the Congressional library. We sometimes read that a certain play of Shakespeare was entered at Stationers' Hall. We find that the entry really made was a brief identifying reference, preliminary to obtaining license to print. Such instances of the use of the word, and of the phrase in which it occurs, might be multiplied indefinitely, but these are enough to show that this usage is quite common. Now, if we substitute in all these and like cases the word 'copy' or the phrase 'enter at large' for the word 'enter,' we are conscious at once that a great change has been made. Indeed, the mere fact that the qualifying words 'at large,' 'at length,' 'in full,' do so often accompany the word 'enter' is proof that all feel that it is not a synonym of the word 'copy.' . . .

"This is sufficient to uphold the amendment, unless we can see from the context that something else was meant. We perceive no such intent. The evident purpose of the entire provision doubtless was to preserve a record of the vote. As a majority controls the journals, it may have been apprehended that it might be made to appear that the proposal was duly passed although lacking the requisite majority, and so it was required that the yeas and nays be entered. But however this may be, the principal thing is the record of the yeas and nays, and this purpose is accomplished as perfectly by the entry made as it would be by any other.

"As to preserving the identity of the amendment proposed, there is no greater difficulty in this matter than with reference to bills."

The Maryland court of appeals, in *Worman v. Hagan*, 78 Md. 152, 27 Atl. 616, 21 L. R. A. 716, 719, reached the same conclusion, making the following observations:

"The fourteenth article of the constitution prescribes the mode in which it may be amended. It declares that 'the general assembly may propose amendments to this constitution; provided that each amendment shall be embraced in a separate bill, embodying the article or section as the same will stand when amended and passed by three fifths of all the members elected to each of the two houses, by yeas and nays, to be entered on the journals with the proposed amendment.' We find that the legislature, by the act of 1890, chap. 255, pro-

posed an amendment to section first of article seven, and that the act was passed by three fifths of all the members elected to each house. It was stated on the journal of each house that 'An Act to Amend Section One of Article Seven of the Constitution of This State' was passed, and the yeas and nays are set forth, being more than three fifths of all the members elected to each house. The requirements of the constitution were in all respects observed, unless it is necessary, as maintained by the appellants, that the act should be set out verbatim on the journals. Each house had the bill in its possession when it passed it, and the bill was fully and clearly identified by its title. There would have been no greater certainty if every word of it had been recited. We must give a reasonable construction to the words of the constitution. There was but one bill with this title. The entries on the journals of the two houses that this bill had been passed by the yeas and nays, which were stated, described their legislative action as distinctly as it could be expressed. The yeas and nays were associated as closely as possible with the enactment contained in the bill,—that is to say, with the proposed amendment. It was not in the power of any person to mistake the meaning of the entry."

The following decisions are to the same effect: *State ex rel. Adams v. Herried*, 10 S. D. 109, 72 N. W. 93; *Constitutional Prohibitory Amendment Cases,* 24 Kan. 700; *In re Senate File 31*, 25 Neb. 864, 41 N. W. 981. The supreme courts of Iowa and Nevada entertain a contrary view. *Koehler v. Hill*, 60 Iowa 543, 14 N. W. 738, 15 N. W. 609; *State ex rel. Stevenson v. Tufly*, 19 Nev. 391, 12 Pac. 835, 3 Am. St. 895. Some cases have come to our notice involving constitutional provisions requiring proposed amendments to be "entered in full" upon the legislative journals; but we think the decisions rendered under such provisions are of no aid here. We are of the opinion that the weight of authority, as well as the better reason, supports the view that it is sufficient compliance with our constitution to enter upon the journals of the senate and house reference to the proposed amendment, using the language of the title of the proposing act as was done in the proposal of this amendment. We conclude

that this amendment has not failed of lawful adoption because of the manner in which record thereof was made of its proposal by the legislature.

It is contended that the proposed constitutional amendment was not authoritatively published in the several counties of the state as required by art. 23, § 1, of the constitution, which provides:

"The legislature shall also cause the amendments that are to be submitted to the people to be published for at least three months next preceding the election, in some weekly newspaper in every county where a newspaper is published throughout the state."

By § 2 of the act proposing the amendment, the legislature directed publication thereof. as follows:

"The secretary of state shall cause the amendment proposed in section one of this act to be published for three weeks next preceding the said election therein described in some weekly newspaper in every county where a newspaper is published throughout the state." Laws 1911, p. 505, § 2.

This, it will be noticed, when read literally, is an authorization for the secretary of state to publish the proposed amendment for three weeks, instead of three months as specified in the constitution. It is insisted that this is fatal to the validity of the proposed amendment regardless of the time it may have been actually published by the secretary of state, it being argued that any publication by the secretary of state beyond the time specified in the act would be a publication without authority and, therefore, of no avail. It is conceded that the secretary of state did publish the proposed amendment for three full months next preceding the general election of 1912, in a weekly newspaper printed and published in each and every county of the state. Counsel invoke the general rule that an election called without authority of law will be held void, regardless of how fairly conducted.

The question then really is: Was the publication for three months prior to the election made by the secretary of state,

without lawful authority? Such publication was clearly suffi-
cient, unless rendered ineffectual by the mere fact that the
words "three weeks" appear in § 2 of the act as above quoted
instead of the words "three months" as required by the con-
stitution. After a reading of this entire act purporting to
submit to the people this constitutional amendment, having
in mind its manifest intent, it seems to us nothing could be
plainer than that the legislature intended to propose and
cause to be submitted to the people of the state this amend-
ment to the constitution in such manner that it would be con-
stitutionally and legally adopted if ratified by a majority of
the electors voting thereon. The very first declaration in
the act is that, at the general election to be held in 1912,
"there shall be submitted to the qualified electors of the state,
for their adoption and approval or rejection, an amendment
of article one (1) of the constitution of the state of Wash-
ington . . . and which shall read, as follows." In the
light of this declaration, we cannot escape the conclusion
that the words "three weeks," found in § 2 of the act, as above
quoted, were intended by the legislature to read "three
months," so as to meet the requirements of the constitution.
To hold otherwise would be to convict the legislature of an
intention to pass this submission act without any purpose
whatever, unless it be to make a mere pretense of satisfying
what they conceived to be a public demand, but with a "joker"
in the proposal, to the end that the will of the people might
ultimately be defeated should they adopt the proposed amend-
ment at the polls. We are of the opinion that the proposed
amendment did not fail of adoption because of the use of the
words "three weeks" instead of "three months" in § 2 of the
act, the proposed amendment having been published in such
manner as to satisfy all of the requirements of the constitu-
tion by the secretary of state, the officer who was by the legis-
lature directed to publish the same. We conclude that the
legislature intended the secretary of state to so publish the
proposed amendment, to the end that it might be constitution-

ally adopted, if ratified by a majority of the electors voting thereon.

Some contention is made that the title of the act proposing the amendment to the constitution, as well as the expression of the subject-matter of the amendment upon the ballots used by the voters, was misleading to the voters. Section·3 of the act provides for the form of ballots to be used as follows:

"There shall be printed on all ballots provided for the said election, the words:

" 'For the proposed amendment to article one (1) of the constitution, by adding thereto at the end of said article one (1) two new sections to be numbered sections 33 and 34 of said article one (1) authorizing and providing for the recall and discharge of any elective public officer and election of his successor.' 'Against the proposed amendment to article one (1) of the constitution, by adding thereto at the end of said article one (1) two new ·sections to be numbered sections 33 and 34 of said article one (1), authorizing and providing for the recall and discharge of any elective public officer and election of his successor.' "

This statement of the question on the ballot, it will be noticed, is, like the title, somewhat broader than the provisions of the proposed amendment, in that it seems to refer to all officers without exception, and also to the election of successors. The title of the act, we have seen, served its purpose as such, and was not misleading or deceptive to the members of the legislature, and was therefore sufficient. The same, we think, may be said as to this statement of the subject-matter of the proposed amendment found upon the ballot. Neither the title of the act nor this statement upon the ballot constituted the notice given to the people of the contents of the proposed amendment. That, as we have seen, was published in full for a period of three months in ·every county in the state. So far as the people were informed of the contents of that amendment, its publication constituted their notice. The statement upon the ballot was not required to be more than a mere reference in very general terms, to the constitu-

tional amendment to be voted on. *State ex rel. Thompson v. Winnett*, 78 Neb. 379, 110 N. W. 1113, 10 L. R. A. (N. S.) 149. This statement upon the ballot clearly would direct the mind of a person of ordinary intelligence to this proposed amendment. No other proposed constitutional amendment of like import was then before the people to be voted upon. The ballot manifestly had reference to this particular proposed constitutional amendment and a vote in the terms as expressed upon the ballot for or against such amendment was a vote for or against this amendment, and no person of ordinary intelligence could have thought otherwise. We are of the opinion that the amendment did not fail of adoption because of the manner of stating the subject-matter thereof upon the ballot.

It must be conceded that there has attended the proposal and submission of this constitutional amendment to the people some informalities out of keeping with ideally correct methods of legislation. But it seems to us the objections claimed to render void the proposal and submission of the amendment to the people deal with matters of form rather than substance. This amendment received, favoring its adoption, 112,320 votes; while against its adoption there were but 46,372. Not only did the people have ample legal notice, as we have seen, of the contents of the proposed amendment prior to the election of 1912, and of the fact that it was to be voted upon at that election, but it is a matter of common history, to which the court will not shut its eyes, that the subject of recall, and this proposed constitutional amendment thereon, was one of the public questions uppermost in the minds of our people from the time of the passage of the act proposing the amendment until the vote was had thereon at the 1912 election, a period of nearly two years. In conclusion upon this branch of the case, we quote with approval the language of Judge Haney, speaking for the supreme court of South Dakota, in *State ex rel. Adams v. Herried*, 10 S. D. 109, 72 N. W. 93:

"It is well settled that provisions of a constitution, while mandatory, are, like statutes, to receive a fair and reason-

able construction with the view of ascertaining the intention of the two houses of the legislature and the people in their proceedings taken to effect an amendment; and it is the duty of courts, when that intent is ascertainable from the proceedings taken, to carry it into effect. The action of the two houses, and the will of the people, as expressed by their vote, should not be set aside or disregarded upon purely technical grounds when no material requirement of the constitution has been omitted and where the proceedings taken clearly manifest the intention of these bodies and the people to amend the fundamental law."

We conclude that the amendment was lawfully submitted to and adopted by the people of the state, and thereby became a part of our fundamental law.

It is contended that the legislature has not passed the necessary laws to carry out the provisions of this constitutional amendment, even conceding that it has been legally adopted by the people. The legislature of 1913 passed an act manifestly intended for that purpose. Laws of 1913, ch. 146, page 454 (3 Rem. & Bal. Code, § 4940-1 et seq.). That act provides, in substance, that, whenever a legal voter desires to demand the recall and discharge of an elective officer, he shall prepare a typewritten charge, reciting that the officer has committed an act or acts of malfeasance, or an act or acts of misfeasance while in office, or has violated his oath of office, stating the act or acts complained of in concise language, verify the same and file it, in case the officer whose recall is demanded be a county officer, with the county auditor. Thereupon the county auditor is required to prepare a synopsis of the charge or charges, constituting a concise statement thereof not to exceed two hundred words, which synopsis is to be embodied in a formal petition, which petition, when so prepared and printed, may be circulated for signatures of voters; and, when signed by twenty-five per cent of the legal voters of the county and properly verified, becomes authority for the county auditor to call an election to determine the question of recall and discharge

of the officer whose recall and discharge is sought. In this case, respondent Young had filed such a petition, the sufficiency of which is not challenged, and the auditor was proceeding to make the synopsis and prepare the formal printed petition for the signatures of the necessary twenty-five per cent of the voters, when this proceeding was commenced in the superior court.

The argument of learned counsel for appellant seems to be that, since the constitutional amendment provides that an officer shall be subject to recall whenever a petition demanding his recall has been filed, "reciting that such officer has committed some act or acts of malfeasance or misfeasance while in office, or who has violated his oath of office," that there is thereby contemplated a hearing of a judicial nature to determine the truth of the charges made against such officer before the question of his recall and discharge can be submitted to the people at an election called for that purpose. In other words, the argument seems to be that, since the officer is to be discharged for cause, there is involved, at least in a measure, his right to the office as a property right. We are not unmindful of the general rule that, as between two persons claiming an office, the right thereto is, in a sense, regarded as a property right when involved in a judicial proceeding, but we are unable to see that there is any right of that nature here involved; for, as between the officer and the public, so far as his right to hold the office is concerned, there is manifestly no property right whatever involved. The people, speaking in the manner provided by law, may discharge their public officers for any cause, or without any cause, as their laws may provide. Indeed, the people's rights are as complete in that respect as when they choose such officer. In other words, as against the people, a public officer, their servant, has no rights whatever, so far as his possession of the office is concerned, which may not be ignored by the people speaking in a lawful manner. While it seems true that, under this constitutional provision, an officer is to be removed for

cause only; yet, the question being purely a political one, unless expressly provided otherwise by statute or constitution, it is manifest that the tribunal before which the sufficiency of the cause is to be tried is that of the people. It may be that the courts have jurisdiction to determine the sufficiency of the statement of the allegations made as cause for removal if presented in a proper proceeding involving the question of the calling of the election, but the trial of the question of whether such cause actually exists, and as to whether the officer shall be discharged, is to be had before the tribunal of the people and decided by them at the polls. It is not the trial of a question of life, liberty, or property; hence there is not involved any question of due process of law guaranteed by the state or Federal constitution cognizable by the courts. Express constitutional and statutory provisions might make such question triable in the courts, but we have no such provisions. We are of the opinion that the act of the legislature of 1913 amply provides for the carrying out of the provisions of the amendment relating to the recall of public officers, and that it is not defective in that the truth of the charges upon which the officer is sought to be recalled is triable before the people rather than before the courts.

Finally, it is contended that the act of 1913, providing for the carrying out of the provisions of the constitutional recall is not applicable to this case because it is not retroactive in its effect. This law went into effect in June, 1913. The acts of malfeasance charged against appellant, upon which it is sought to have him recalled and discharged, occurred before that time. The right of recall, it is plain, existed in the people immediately upon the adoption of this constitutional amendment which occurred at the general election in 1912, at which election appellant was also elected sheriff of King county. His alleged acts of malfeasance occurred, if at all, after that time and after the right of the people to invoke the recall provisions of this amendment and become fixed, though there was no remedial statute providing the method of its

exercise. We think this statute should be construed as to its retroactive effect like any ordinary remedial statute. It is manifestly for the purpose of making effective the exercise of a right which was in existence before its passage. In the text of 36 Cyc. 1209, it is said:

"In accordance with the general rule that remedial statutes should be given a liberal construction, they will be freely construed to have a retrospective operation whenever such seems to have been the intention of the legislature, unless such a construction would impair the validity of contracts, disturb vested rights, or create new obligations."

This principle, we think, renders appellant's contention as to the retroactive effect of the law unavailing. We conclude that the judgment must be affirmed.

It is so ordered.

CROW, C. J., MOUNT, MORRIS, and FULLERTON, JJ., concur.