COULTER v. DODGE, CHANCELLOR.

4-5461.

125 S. W. 2d. 115

Opinion delivered February 13, 1939.

*Will G. Akers,* for petitioner.

*Bradley & Patten,* for respondent.

SMITH, J. Without stating how this case arose, it will suffice to say that the question presented for our decision is whether the proposed amendment to the Constitution, submitted at the last General Election November .8, 1938, as proposed amendment to the Constitution No. 24, was legally submitted at that election. It is not questioned that a sufficient vote for the amendment was cast to adopt it under the decision in the case of *Brickhouse* v. *Hill,* 167 Ark. 513, 268 S. W. 865. The question presented is whether the requirements of the Constitution in regard to amendments proposed by the General Assembly were sufficiently complied with to authorize the submission of the amendment to the electorate.

There are no controverted or disputed questions of fact in the case. There is a stipulation as to the facts, which we have verified by an examination of the journals of the Senate and of the House of the 1937 session of the General Assembly.

The facts are that on January 15, 1937, Joint Resolution No. 1 was introduced in the Senate. It was spread at length on the Senate Journal. The resolution was read the first time, the rules were suspended, and the resolution was read the second time and referred to the Senate Committee on Constitutional Amendments.

We copy from the published journal of the Senate, pages 106 and 107, the following recitals there found:

"SENATE JOINT RESOLUTION No. 1

"By Senator Norrell.

"A resolution to submit an amendment to the Constitution, to provide that the judge of the chancery court of each county shall preside over the probate court of such county; providing for the trial of all probate court matters before the judge of said court, and for appeals from probate courts to the Supreme Court of Arkansas; and authorizing the legislature to provide for a clerk for the probate court, or to consolidate chancery and probate courts; amending §§ 19, 34 and 35 of Art. VII of the Constitution.

"Be It Enacted by the House of Representatives of the State of Arkansas and the Senate of the State of Arkansas, a majority of all the members elected to each House agreeing thereto, that the following be, and the same is hereby, proposed as an amendment to the Constitution of the State of Arkansas, to-wit:

"Section 1. Section 34 of Art. VII of the Constitution is hereby amended to read as follows:

" 'Section 34. In each county the judge of the court having jurisdiction in the matters of equity shall be judge of the court of probate, and have such exclusive original jurisdiction in matters relative to the probate of wills, the estates of deceased persons, executors, administrators, guardians, and persons of unsound mind and their estates, as is now vested in courts of probate, or may be hereafter prescribed by law. The judge of the probate court shall try all issues of law and of fact arising in causes or proceedings within the jurisdiction of said court, and therein pending. The regular terms of the courts of probate shall be held at such times as is now or may hereafter be prescribed by law; and the General Assembly may provide for the consolidation of chancery and probate courts.'

"Section 2. Section 35 of Art. VII of the Constitution of Arkansas is hereby amended to read as follows:

" 'Section 35. Appeals may be taken from judgments and orders of courts of probate to the Supreme Court; and until otherwise provided by the General Assembly, shall be taken in the same manner as appeals from courts of chancery and subject to the same regulations and restrictions.'

"Section 3. Section 19 of Art. VII of the Constitution of Arkansas is hereby amended to read as follows:

" 'Section 19. The clerks of the circuit courts shall be elected by the qualified electors of the several counties for the term of two years, and shall be ex-officio clerks of the county and probate courts and recorder, provided that in any county having a population exceeding fifteen thousand inhabitants, as shown by the last Federal census, there shall be elected then a county clerk, in like

manner as the clerk of the circuit court, and in such case the county clerk shall be ex-officio clerk of the probate court of such county until otherwise provided by the General Assembly.'

"Section 4. The provisions of the Constitution of the State of Arkansas in conflict with this amendment are hereby repealed in so far as they are in conflict herewith; and this amendment shall take effect on the first day of January next following its adoption.

"(Signed) W. F. Norrell."

"Senate Joint Resolution No. 1 was read the first time, rules suepended, and read second time and referred to Committee on Constitutional Amendments."

On January 25 the Senate Committee on Constitutional Amendments reported the resolution back to the Senate, with the recommendation that it "do pass." On January 26 the resolution was called up for its third reading and final passage by the Senate. Again it was spread at length on the Senate Journal. It was placed on third reading and final passage. The roll was called by the secretary of the Senate and the yeas and nays were duly entered on the Senate Journal. There were 30 yeas and 1 nay. Four members of the Senate failed to vote. The resolution was declared adopted and was ordered transmitted to the House of Representatives.

On the same day, January 26, the secretary of the Senate, appearing before the bar of the House of Representatives, read to that body his official message transmitting to it Senate Joint Resolution No. 1, together with other measures which had been adopted by the Senate. That portion of this message dealing with Senate Joint Resolution No. 1 reads as follows:

"The sergeant-at-arms announced a message from the Senate, whereupon the secretary of the Senate appeared within the bar of the House and read the following communication:

"FIFTY-FIRST GENERAL
"ASSEMBLY
"ARKANSAS SENATE
"Little Rock, Arkansas,
"January 26, 1937.

"Mr. Speaker: I am instructed by the Senate to inform your honorable body of the passage of Senate Joint Resolution No. 1 by Senator Norrell, the same being a resolution to submit an amendment to the Constitution to provide that the judge of the chancery court of each county shall preside over the probate court of such county; providing for the trial of all probate matters before the judge of said court, and for appeals from the probate court to the Supreme Court of Arkansas; and authorizing the legislature to provide for a clerk for the probate court, or to consolidate chancery and probate courts; amending §§ 19, 34, 35 of Art. VII of the Constitution."

The secretary of the Senate duly delivered the resolution to the House, but neither the resolution nor the proposal embodied therein was spread at length on the House Journal.

On the same day of its receipt by the House the resolution was read for the first time in the House, the rules were suspended and the resolution was read the second time and it was then referred to the House Committee on Constitutional Amendments.

The descriptive reference which the House Journal makes to the resolution reads as follows:

"SENATE JOINT RESOLUTION No. 1
"By Senator Norrell.

"A resolution to submit an amendment to the Constitution, to provide that the judge of the chancery court of each county shall preside over the probate court of such county; providing for the trial of all probate court matters before the judge of said court, and for appeals from probate courts to the Supreme Court of Arkansas; and authorizing the legislature to provide for a clerk for the probate court, or to consolidate chancery and probate

.courts; amending §§ 19, 34 and 35 of Art. VII of the Constitution.

"Was read the first time, the rules were suspended, and read the second time and referred to Committee on Constitutional Amendments."

Neither the resolution nor the proposal embodied in it was spread at length on the House Journal, there being entered only the synopsis thereof above quoted.

On February 19 the House Committee on Constitutional Amendments reported the resolution back to the House, with the recommendation that it "do pass." On February 23 the resolution was read the third time in the House, and placed on its final passage. The clerk of the House called the roll, and duly entered the yeas and nays on the journal. The vote was : Yeas 60; nays 20; not voting 19. The resolution was duly declared adopted by the House. A motion to reconsider the vote by which the resolution was adopted, and to lay that motion on the table, was passed, and the motion was accordingly laid on the table, but here again there was a failure to spread the resolution at length on the journal of the House.

On February 24 the clerk of the House returned the resolution to the Senate with the following message:

"The sergeant-at-arms announced a message from the House, whereupon the chief clerk appeared within the bar of the Senate and read the following communication:

"Little Rock, Arkansas,
"February 24, 1937.

"Mr. President: I am instructed by the House of Representatives to inform your honorable body of the passage of Senate Joint Resolution No. 1 by Senator Norrell, the same being a joint resolution to submit an amendment to the Constitution, to provide that the judge of the chancery court of each county shall preside over the probate court of such county; providing for the trial of all probate court matters before the judge of said court, and for appeals from the probate court, to provide a clerk for the probate court, or to consolidate the chan- ·

cery and probate courts, amending §§ 19, 34, and 35 of Art. VII of the Constitution.

"And I herewith return the same.

Respectfully submitted,

"(Signed)  A. M. Ledbetter, Jr.

"Chief Clerk."

This message was spread upon the journal of the Senate, but the resolution to which it referred was not again entered upon the Senate Journal.

On February 26 the Committee on Enrolled Bills of the Senate reported to the Senate that it had compared the enrolled copy of Senate Joint Resolution No. 1 with the original, and that it found the same correctly enrolled, and on the same day the Committee on Enrolled Bills reported to the Senate that it had on that day delivered to the Governor for his action Senate Joint Resolution No. 1, and on February 27 the Governor reported to the Senate that he had approved the resolution.

It may be first said that the Governor had no duty to perform in connection with the authorization of the submission of the amendment, and his action thereon in approving the amendment added nothing to, and subtracted nothing from, the validity of the legislative action. *Mitchell* v. *Hopper,* 153 Ark. 515, 241 S. W. 10.

The insistence is that the failure of the House of Representatives to enter at length the resolution upon the Journal of that body is a fatal defect in the proceedings, for the reason that the Constitution requires this entry at length upon the journals of both the Senate and the House.

Let it be remembered that we are considering now only proposals to amend the Constitution submitted by the General Assembly. An entirely different procedure is applicable to amendments proposed under the Initiative and Referendum Amendment No. 7.

Section 22 of Art. XIX of the Constitution provides the manner in which proposals to amend the Constitution may be submitted to the people by the General Assembly. It reads as follows:

"Section 22. Either branch of the General Assembly at a regular session thereof may propose amendments to this Constitution, and, if the same be agreed to by a majority of all members elected to each House, such proposed amendments shall be entered on the journals with the yeas and nays, and published in at least one newspaper in each county, where a newspaper is published, for six months immediately preceding the next general election for Senators and Representatives, at which time the same shall be submitted to the electors of the state for approval or rejection; and if a majority of the electors voting at such election adopt such amendments the same shall become a part of this Constitution; but no more than three amendments shall be proposed or submitted at the same time. They shall be so submitted as to enable the electors to vote on each amendment separately."

This section of the Constitution was analyzed and construed in the case of *McAdams* v. *Henley*, 169 Ark. 97, 273 S. W. 355, 41 A. L. R. 629, where the conflicting authorities and the different rules of construction were reviewed and discussed, and it would be a work of supererogation to review a question so thoroughly considered in that opinion by the late Chief Justice McCulloch.

That opinion points out that in proposing amendments to the Constitution the General Assembly acts, not in its legislative capacity, but in the nature of a constitutional convention proposing amendments for action by the electorate. It was there pointed out that in proposing amendments to the Constitution something more was required than in passing ordinary legislation. Ordinary bills, in their passage through the General Assembly, may be identified by title and number, but not so with constitutional amendments. It is required that the latter be entered upon the journals of both the Senate and the House, as was there said, but that language must be construed with reference to the facts to which it was there applied.

There the facts were that a joint resolution proposing a constitutional amendment was passed in the Sen-

ate, but it was materially amended in the House, and was returned to the Senate as amended, and the Senate Journal did not reflect what action was taken by the Senate in regard to the House amendment.

Upon this state of the record Judge McCULLOCH said: "The real question is whether the omission from the Senate journals of the House amendment and the substantial differences between the amendment entered on the journal of the Senate and the one submitted to the people renders the adoption by the people ineffectual." The amendment submitted to the people was, in fact, the Senate resolution, as amended by the House. In other words, it was essential that the journals of both the House and Senate show definitely and certainly what amendment had been approved for submission, and that both the House and the Senate had concurred in the submission of the same amendment, and that the journals of the two Houses, when read together, make this fact definite and certain.

No such question is presented here. The resolution was properly entered upon the journal of the Senate, and the resolution was passed by the House without amendment of any kind, material or otherwise. Had the House amended the Senate resolution, as was done in the case of *McAdams* v. *Henley,* supra, then it would have been necessary for the House to enter the resolution, as amended, *in extenso,* upon the journal of the House, and if the Senate concurred in the amendment made by the House, it would also have been necessary for the Senate to again enter upon its journal the amended resolution, thus showing its concurrence therein. That was not done in the McAdams case, *supra,* and for that reason it was held, in answering the question above copied, which Judge McCULLOCH had propounded, that the submission of the amendment was not authorized and its adoption by the people was ineffectual.

The opinion in the McAdams case, *supra,* does say: "Our conclusion is that the proposal of an amendment to the Constitution is void unless the amendment is entered *in extenso* on the journals of each of the two houses

of the General Assembly, and that a mere identifying reference by title or otherwise is insufficient.'' But, as we have said, that language is to be construed with reference to the facts to which it was applied. The Senate Journal in that case reflecting the final action by the Senate recites only that ''Senate General Resolution No. 9, by Norfleet and Caldwell, was read the third time and placed on its final passage.'' The resolution had then been amended in, and returned by, the House to the Senate, and this identifying reference to the resolution as ''Senate Joint Resolution No. 9, by Norfleet and Caldwell,'' was insufficient. It did not reflect the Senate concurrence in the House amendment, as the resolution submitted by Norfleet and Caldwell did not meet the approval of the House, but had been amended by it.

But, after using the language above copied, Judge McCulloch immediately proceeded to say: ''We do not mean to hold that it is essential to the validity of a constitutional amendment that the entire proposal as it may be affected by amendments adding or subtracting language in the course of its progress through the two houses must be spread upon the journal of either house at the same place or at the same time. Different parts of the journals of the respective houses may, if connected up so that the whole of the amendment as finally adopted by both houses, appears upon the journal of each house, be treated as sufficient to make a complete record; but we do hold that where any substantial part of the amendment is omitted entirely from the journal of either one of the houses, even though it appears on the journal of the other house, it renders the proposal invalid. By way of illustration, we might take the journal of the House in this instance, which shows that the original resolution as introduced in the Senate was spread at large upon the journal, and there were certain amendments which were also separately spread on the journal. Now, if the House had adopted the amendment by a yea and nay vote spread on the record without actually re-entering the amended resolution, that would have been sufficient, because the original Senate resolution and the House amendment are connected together, so that it is in effect

a complete entry of the whole amendment as adopted by the House. But when we come to the Senate Journal, we find nothing there but the entry of the original resolution. If the journal of the Senate had contained a recital of the House amendments and a corrected copy of the same was entered on the journal, an adoption of the amendment would have shown the whole of the resolution that the Senate adopted, and it would have been unnecessary to re-enter the original resolution as amended. The two entries, in other words, would have been sufficient; but, as the journal entry now stands, there is no disclosure whatever on the Senate journal of the House amendment, therefore the Constitution has not been complied with. Nor do we mean to say that a compliance with this provision must be absolutely literal. On the contrary, we say that the omission of an immaterial portion of an amendment—one not affecting its meaning or interpretation—would not affect its validity. It is only a substantial omission from the record which is fatal, and not merely immaterial words which do not affect the real meaning of the proposal. It is easily seen that the House amendments are substantial, and that the omission of them from the journal is an important departure from the text of the proposal as amended by the House.''

When the journals of the two houses are read together in the instant case, it is made certain that both houses passed the same amendment. The journal of the House did not identify the Senate resolution to which it gave approval merely by reference to its title or number. On the contrary, there was entered upon the House journal a synopsis of the resolution which identifies it beyond the possibility of controversy as to whether the House was assenting to the Senate resolution. Had the House amended the Senate resolution in any particular, we would have presented the question involved in the McAdams Case, and in that event, it would have been essential, as held in that case, to enter the resolution as finally passed *in extenso* upon the journals of both houses.

We conclude, therefore, that the instant case is distinguishable, under the facts, from the McAdams Case,

and that it should be held in the instant case that the submission to the people of Senate Joint Resolution No. 1 was properly authorized.

There remains only the question presented as to when the amendment becomes effective. The amendment recites that it "shall take effect on the first day of January next following its adoption."

In the case of *Matheny* v. *Independence County*, 169 Ark. 925, 277 S. W. 22, a proposed amendment, which provided that it should take effect and be in operation sixty days after its passage and adoption by the people of the state, received a majority vote of the electors at the general election held October 7, 1924, which was at that time the date fixed by law for the submission of constitutional amendments to the electors for approval or rejection. That amendment, like the one here under consideration, was proposed by the General Assembly. It was there held that the amendment was adopted on the date of the election, but did not take effect until sixty days thereafter (December 7, 1924), for the reason that the amendment so provided.

Upon the authority of this Matheny Case, we hold that the amendment was adopted at the general election held November 8, 1938, and, as the amendment provided that it shall be effective the first day of January next following its adoption, we hold that the amendment is now in effect and has been since January 1, 1939.

The prayer for a writ of prohibition will be denied.

MEHAFFY, J., concurs.

MEHAFFY, J. (concurring) The facts are stated fully in the majority opinion, and I concur fully in the conclusion reached, holding that the amendment is now in effect and has been since January 1, 1939. As stated by the majority opinion, the insistence is that the failure of the House of Representatives to enter at length the resolution upon the journal body is a fatal defect in the proceeding, for the reason that the constitution requires this entry at length upon the journals of both the Senate and House.

The Constitution provides the manner in which amendments may be submitted by the General Assembly. Section 22 of art. 19, provides that either branch of the General Assembly at a regular session thereof may propose amendments to this constitution, and if the same be agreed to by a majority of all members elected to each house, such proposed amendments shall be entered on the journals with the ayes and nays, etc.

The question is, what is the meaning of the word "entered". It is the contention of appellants that it means "spread at length". We think that not only the weight of authority, but reason also is to the effect that "entered", used in the provision of the constitution, does not mean "spread at length".

In the case of *Boyd* v. *Olcott,* 102 Ore. 327, 202 Pac. 431, the Supreme Court of Oregon decided this question. It is stated by that court:

"If the resolution is written out in full in the journal, it is, of course, entered in the journal, and so, too, when the journal contains a record sufficient to identify a given resolution it is entered in the journal within the meaning of the word "entered" as that word is naturally and popularly understood; but, nevertheless, the authorities are divided upon the question as to whether or not the word "entered", when found standing alone, requires recording in full *in extenso,* at length, or is satisfied if the journal contains references sufficient for identification. 6 R. C. L. 29. After a careful examination of many authorities discussing the subject, it is our conclusion that a great majority of the reported judicial decisions, when read and analyzed in the light of the facts upon which they are based, support the rule that an identifying reference is a full compliance with a constitution requiring that a resolution be "entered in" the journal. See 12 C. J. 692; Ex Parte Ming, 42 Nev. 472, 181 Pac. 319, 6 A. L. R. 1216. The following are a few of the many reported decisions holding that an identifying reference satisfies the requirements of a constitution worded like our constitution:

Ex Parte Ming, 42 Nev. 472, 181 Pac. 319, 6 A. L. R. 1216; *Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5, 12 Pac. 801, 1 Am. St. Rep. 17; *Thomason* v. *Ashworth,* 73 Cal. 73, 14 Pac. 615; Constitutional Prohibitory Amendment, 24 Kan. 700; *Cudihee* v. *Phelps,* 76 Wash. 314, 136 Pac. 367; *Gottstein* v. *Lister,* 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917D, 1008; *State ex rel. Adams* v. *Herreid,* 10 S. D. 109, 72 N. W. 93; *Worman* v. *Hagan,* 78 Md. 152, 27 Atl. 716, 21 L. R. A. 716; In re Senate File, 25 Neb. 864, 41 N. W. 981; *Lee* v. *Price,* 54 Utah 474; 181 Pac. 948; *West* v. *State,* 50 Fla. 154, 39 So. 412.''

In the same opinion the Oregon court also said:

''When the constitution, as a whole, is taken by its four corners and examined as an entirety, and Article 17 is read in connection with the remainder of the instrument, it will become obvious that the conclusion that the words ''entered in'' as used in Article 17 are satisfied when the entry consists of an identifying reference, and that they do not mandatorily compel an entry in full, is the only conclusion which can be reasonably drawn.''

If a bookkeeper is required to enter a promissory note on his ledger, he does not copy the note in full; no person would expect him to do that; and all that he is required to do is to enter an identifying reference. A court should not close its eyes and refuse to believe what every intelligent person believes.

The Utah Court said, in the case of *Lee* v. *Price, et al.,* 54 Utah 474, 181 Pac. 948: ''The only purpose of entering a proposed amendment upon the journals is to keep a record that will be sufficiently certain to identify the proposition to be submitted to the people, and that the identical amendment proposed shall be the one voted upon by the electors. In the instant case it is conceded that the proposed amendment was submitted to the people and adopted by an overwhelming majority of the electors voting thereon. In our opinion it would do violence to both the spirit and letter of the law to hold that the formal entry on the legislative journals is subject to some technical criticism, and that therefore the

amendment should be declared void and invalid and the expressed will of the people thwarted. In the opinion in the "Prohibitory Amendment Cases," 24 Kan. 499, Mr. Justice Brewer, who thereafter served with distinction as a member of the Supreme Court of the United States, brushed aside all sophistry and all technicalities, and discussed the question under consideration in these clear and forceful words: "It is a proposition to amend the Constitution in the nature of a criminal proceeding, in which the opponents of change stand as defendants in a criminal action, entitled to avail themselves of any technical error or mere verbal mistake; or is it rather a civil proceeding, in which those omissions and errors which work no wrong to substantial rights are to be disregarded? Unhesitatingly, we affirm the latter. . . ."

In the same opinion, it is also said: "This is a government by the people, and, whenever the clear voice of the people is heard, Legislatures and courts must obey. True, a popular vote without previous legislative sanction must be disregarded. There is no certainty that all who could would take part in such a vote, or that they who did, all realize that it was a final action. It lacks the sanction of law, is a disregard of constitutional methods and limitations, and should be taken as a request for a change, rather than as a change itself. But, notwithstanding, this, legislative action is simply a determination to submit the question to popular decision. It is in no sense final. No number of legislatures, and no amount of legislative action, can change the fundamental law. This was made by the people, who alone can change it. The action of the Legislature in respect to constitutional changes is something like the action of a committee of the Legislature in respect to the legislative disposition of a bill. It presents, it recommends, but it does not decide. And who ever thought of declaring a law invalid by reason of any irregularities in the proceedings of the committee which first passed upon it? It is the legislative action which is considered in determining whether the law had been constitutionally passed; and it is the popular action which

is principally to be considered in determining whether a constitutional amendment has been adopted."

The Supreme Court of Washington, in the case of *Cudihee* v. *Phelps,* 76 Wash. 314, 136 Pac. 367, had this identical question before it, and cited many authorities to sustain the proposition that the word "enter" did not mean copy or enter at length or enter in full, but simply meant a brief, identifying reference, and among other things, that court said:

"We find that the entry really made was a brief identifying reference, preliminary to obtaining license to print. Such instances of the use of the word and of the phrase in which it occurs might be multiplied indefinitely, but these are enough to show that this usage is quite common. Now, if we substitute in all these and like cases the word 'copy' or the phrase 'enter at large', for the word 'enter' we are conscious at once that a great change has been made. Indeed the mere fact that the qualifying words 'at large', 'at length', 'in full', do so often accompany the word 'enter' is proof that all feel that it is not a synonym of the word 'copy'. . . . This is sufficient to uphold the amendment, unless we can see from the context that something else was meant. We perceive no such intent. The evident purpose of the entire provision doubtless was to preserve a record of the vote. As a majority controls the journals, it may have been apprehended that it might be made to appear that the proposal was duly passed, although lacking the requisite majority, and so it was required that the yeas and nays be entered. But, however this may be, the principal thing is the record of the yeas and nays, and this purpose is accomplished as perfectly by the entry made as it would be by any other. As to preserving the identity of the amendment proposed, there is no greater difficulty in this matter than with reference to bills." There are very many authorities on this question, but it would serve no useful purpose to review them here. Many of them are referred to in the cases we have cited. There is some conflict in the authorities, but in my opin-

ion, the overwhelming weight of authority supports the rule here announced.

If the makers of the Constitution had intended that the resolution and amendment should be spread at length or copied in full, they would have said so. When the whole Constitution is considered, we think there can be no doubt about this question.

In art. 5, § 22 of the Constitution, it is provided that every bill shall be read at length in each house, and § 23 of art. 5 of the Constitution provides that no law shall be revived, amended or the provisions thereof extended, by reference to its title only, but so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length.

It is said in 11 Am. Jur. p. 638: "On the other hand, the rule has been laid down that after ratification by the people, every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to a state constitution or the legality of a new constitution; and unless the courts are satisfied that the constitution has been violated in the submission of a proposed amendment, they should uphold it. The view is taken that substance is more important than form, and that the will of the legislature lawfully expressed in proposing an amendment and the will of the people expressed at the proper time and in the proper manner in ratifying such amendment ought not to be lightly disregarded."

The majority opinion discusses the case of *McAdams* v. *Henley,* 169 Ark. 97, 273 S. W. 355, 41 A. L. R. 629, where the opinion was delivered by the late Chief Justice McCullough. That case is easily distinguished from the present. It appears from the facts in that case that one house passed a measure, sent it to the other house where it was amended. The house where the measure originated never did agree to the amendment, and the other house never did agree to the original measure without the amendment. It, therefore, clearly appears that the measure passed by one house was different from the measure passed by the other house. No one

contends that either house may submit a constitutional amendment to be voted on by the people, but the identical measure must be passed by both houses, and in the case above referred to, this was not done and for that reason the Legislature had not adopted the proposed amendment, and there was no occasion to decide any other question in that case. We have always held that before a measure becomes effective, whether a bill or proposed constitutional amendment, both houses must pass the same measure. So it is not necessary in this case to overrule the case of *McAdams* v. *Henley*. It is true the question before the court here was discussed in that opinion, but if the opinion is wrong, or that discussion of this question was wrong, the case should be overruled.

I agree with Judge Scott of the Colorado Supreme Court in his dissenting opinion in the case of *Van Kleeck* v. *Ramer*, 62 Colo. 4, 156 Pac. 1108, in which he said: "It may be answered that the people are not always swift to correct a wrong by means of constitutional amendment, it was a long, difficult, and bitter struggle to so secure the initiative and referendum amendment. The people, like the mills of the gods, grind slow, but they sometimes find it necessary to grind exceedingly fine.

"Precedents that find support in sound reason, and tend to promote justice, are strongly persuasive and generally to be followed; but precedents not so supported, or when for any cause the reason for the rule has ceased to exist, obstruct progress, and should be discarded as being both unjust and dangerous. The tendency of courts to so generally rely on case law, regardless of existing reasons that may appeal from righteous judgment, is fast becoming a menace to our government.

"I may be permitted to suggest, for the consideration of courts and judges who feel impelled to sacrifice their sense of reason and justice upon the alter of the Golden Calf of precedent, the quaint philosophy of Sam Walter Foss, in the following lines:"

Judge Scott then quoted a poem by Sam Walter Foss. A portion of that poem reads:

"For thus such reverence is lent
To well-established precedent.
A moral lesson this might teach,
Were I ordained and called to preach.

"For men are prone to go it blind
Along the calf-paths of the mind,
And toil away from sun to sun
To do what other men have done.

"They follow in the beaten track,
And out and in, and forth and back,
And still their devious course pursue
To keep the path that others do."

The doctrine of *stare decisis* does not prevent a re-examination of any question, and a correction of the previously declared law is found erroneous. I think that a great majority of the recent decisions are to the effect that if a case has been decided wrong, it should be promptly overruled, unless it has become a rule of property. When it has become a rule of property, it should then be overruled, if erroneous, unless the overruling would be more harmful than following the erroneous decision.

I think when any measure has been fairly submitted to the people and they have voted on it, adopted it, the measure should be upheld; unless there has been some violation of a provision of the constitution, and I think there has not in this case.

I, therefore, agree with the majority that the amendment was adopted on November 8, 1938, and became effective January 1, 1939.