## McADAMS v. HENLEY.

## Opinion delivered June 29, 1925.

1. EVIDENCE—JUDICIAL NOTICE— LEGISLATIVE JOURNALS.—The courts take judicial notice of the contents of journals of the two houses of the General Assembly.

2. CONSTITUTIONAL LAW—AMENDMENTS TO CONSTITUTION.—In amending the Constitution the General Assembly does not act in the exercise of its ordinary legislative authority, but it acts in the character and capacity of a convention.

3. CONSTITUTIONAL LAW—AMENDMENT TO CONSTITUTION.—The Constitution is the supreme and paramount law, which can be amended only in accordance with the rules thereby prescribed.

4. CONSTITUTIONAL LAW—ENTRY OF AMENDMENT ON JOURNALS.— Const. art. 19, § 22, requiring that proposed amendments to the Constitution "shall be entered on the journals with the yeas and nays," is mandatory and requires that such amendments be entered at length upon the journals of each house of the General Assembly, and it is not sufficient to make a mere identifying reference by title or otherwise.

5. CONSTITUTIONAL LAW—AMENDMENT AS TO LOCAL LAWS.—The omission from the Senate journals of amendments adopted in the House, to the Senate resolution proposing Constitutional Amendment No. 12, prohibiting the passage of local laws by the Legislature *held* to invalidate the amendment for non-compliance with Const. art. 19, § 22, though the amendment received the required number of votes at the next general election.

6. CONSTITUTIONAL LAW—FUNCTION OF COURTS.—Questions of policy are not for the courts, which can only decide whether constitutional limitations are infringed, or whether a constitutional amendment has been approved by the people in the manner prescribed by the Constitution.

7. HIGHWAYS—DIVERSION OF ROAD DISTRICT'S FUNDS.—Acts 1925, No. 53, authorizing a road district to use a part of its funds in part payment of cost of building a new bridge over a small stream crossed by the road *held* not void as impairing vested rights or authorizing the diversion of tax moneys to other uses than those for which the tax was levied, in violation of Const. art. 16, § 11, as the statute constitutes a legislative determination that the bridge is a part of the road.

8. HIGHWAYS—DIVERSION OF TAX MONEYS.—Constitution, art. 16, § 11, prohibiting the use of tax moneys for any other purpose than that for which the tax was levied, applies only to general taxation, not to local assessments.

Appeal from Craighead Chancery Court, Western District; *J. M. Futrell,* Chancellor; reversed.

*Horace Sloan,* for appellant.

*Arthur L. Adams,* for appellee; *Hal L. Norwood,* *amicus curiae.*

McCulloch, C. J.  This case involves the validity of a statute enacted by the General Assembly of 1925 (Act No. 53, unpublished) authorizing a road improvement district in Craighead County to contribute of its funds a specified amount in the construction of a bridge spanning Cache River in the route of the road; and the primarily controlling question in the case is whether or not proposed amendment No. 12, which would prohibit the Legislature from passing bills for local laws and which was voted on at the genaral election of October 7, 1924, was legally adopted.  The validity of the amendment is assailed, on the ground that it was not proposed by the General Assembly in the manner prescribed by the Constitution, in that the proposal was not "entered on the journals with the yeas and nays." Constitution 1874, art. 19, § 22.

The validity of this amendment was not directly involved in the decisions of this court in the recent cases of *Brickhouse* v. *Hill,* and *Arlitt* v. *Hill,* 167 Ark. 513, but those cases are decisive that this amendment received the requisite number of favorable votes for its adoption.

The Constitution of 1874 (art. 19, § 22) prescribes the following method for proposing and adopting amendments thereto:

"Either branch of the General Assembly at a regular session thereof may propose amendments to this Constitution, and, if the same be agreed to by a majority of all members elected to each house, such proposed amendments shall be entered on the journals with the yeas and nays, and published in at least one newspaper in each county, where a newspaper is published, for six months immediately preceding the next general election for

Senators and Representatives, at which time the same shall be submitted to the electors of the State for approval or rejection; and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution; but no more than three amendments shall be proposed or submitted at the same time. They shall be so submitted as to enable the electors to vote on each amendment separately."

It has often been decided by this court that we take judicial notice of the contents of the journals of the two Houses of the General Assembly, and in doing so in the present case we find the following state of the record with reference to the proposal for the adoption of said amendment No. 12.

The proposal originated in the Senate and was designated on the journal as "Senate Joint Resolution No. 9 by Norfleet and Caldwell," and the resolution was spread at large on the journal in the following form:

"Senate Joint Resolution No. 9."

"Proposed Amendment to the Constitution of the State of Arkansas:

"Be it resolved by the Senate of the State of Arkansas and the House of Representatives of the State of Arkansas, a majority of all the members elected to each House agreeing thereto, that the following is hereby proposed as an amendment to section 26 of article 6 of the Constitution of the State of Arkansas, and upon being submitted to the electors of the State for approval or rejection at the next general election for Senators and Representatives, if a majority of the electors voting at such election adopt such amendment, the same shall become a part of the Constitution of the State of Arkansas, towit:

"Section 1. No local or special bill shall be passed by the General Assembly of the State of Arkansas. Counties and municipalities shall have the power of legislation as to all local and special legislation of every

character in and for their respective municipalities and counties, the manner to be provided by law; but no local legislation shall be enacted contrary to the Constitution or contrary to any general law of the State, and any general law shall have the effect of repealing any local legislation which is in conflict therewith. ·

"Municipalities may provide for the exercise of the initiative and referendum as to their local legislation. General laws shall be enacted providing for the exercise of the initiative and referendum for local acts passed as herein provided as to the counties.

"Fifteen per cent. of the legal voters of any municipality or county may order the referendum or invoke the initiative upon any local or special measure.

"In municipalities the number of signatures required upon petition shall be computed upon the total vote cast for the office of mayor at the last preceding general election; in counties upon the office of circuit clerk.

"In municipalities and counties the time for filing an initiative petition shall not be fixed at less than sixty nor more than ninety days before the election at which it is to be voted upon; and for a referendum petition, not less than thirty days nor more than ninety days after the passage of such measure by a municipal council.

"Section 2. This amendment shall take effect and be in force and operation sixty days after its approval and adoption by the people of the State of Arkansas."

On a later day the Senate adopted the resolution by the necessary two-thirds vote, and the resolution, as originally introduced and entered on the journal, was re-entered on the journal together with the yea and nay vote thereon, showing the adoption. The resolution as adopted by the Senate was then transmitted to the House and was read the first time and spread at large upon the journals of the House. There was, according to the recitals in the journal, a motion to table the

resolution, but the motion failed of adoption. On a subsequent day a member of the House offered the following amendment to Senate Resolution No. 9:

"Amendment to Senate Joint Resolution No. 9.'

"Amend Senate Joint Resolution No. 9 by striking out the following words in line 1 of section 1, to-wit: 'or special.'

"Also by striking out the following words from the first paragraph of section 1, to-wit: ''And any general law shall have the effect of repealing any local legislation which is in conflict therewith.'

"Also by striking out from section 2 the following words, to-wit: 'Sixty days.' ''

The journals recite that this amendment to the resolution was read the first and second times and adopted, and immediately following the vote there is a recital in the House journal that Senate Joint Resolution No. 9 was read the third time and placed on final passage, and that the resolution was adopted. This occurred according to the journal, on March 6, 1923, and in connection with this recital in the journal the resolution as it came from the Senate was again spread at large with a recital of the vote by yeas and nays showing the adoption of the resolution by more than two-thirds of the House. The last recital of the House journal, which was on the same day as the adoption of the resolution, was that "Senate Joint Resolution No. 9 was ordered immediately transmitted to the Senate." The recitals of the Senate journal on March 7, 1923, are as follows:

"Senate Joint Resolution No. 9 by Norfleet and Caldwell.

Was read the third time and placed on final passage.

The question being, shall the bill pass?

The Secretary called the roll and the following voted in the affirmative:

(Then follows the entry of the vote by yeas and nays showing the adoption of the amendment). There is no reference anywhere on the Senate journal as to any amendment of the resolution in the house. The Senate journal on March 6, 1923, contains a copy of the message from the House announcing the adoption "of Senate Resolution No. 9 by Senator Caldwell and others," but that announcement makes no mention of any amendment by the House. The last entry on the Senate journal is a report from the Committee on Enrolled Bills to the effect that Senate Joint Resolution No. 9 by Senator Caldwell had been presented to the Governor for his approval. The enrolled resolution on file in the office of the Secretary of State omits the words specified in the House amendment to the resolution, and in this form the proposed amendment was duly advertised and submitted to the voters on the ballot at the general election in 1924.

It is thus seen that the House amendment to the resolution was never entered on the journals of the Senate, and that the proposed amendment which was entered at large on the journals of the Senate is materially different in its language and import from that which was submitted to the people at the next general election.

If we were dealing with the validity or with the construction of a statute enacted by the Legislature, it would be a matter of interpretation or rather a matter of presumption whether the recitals of the House journal meant that the amendment to the resolution was receded from and the original Senate resolution finally adopted, or whether the amended resolution was adopted, notwithstanding the entry at that place on the journals of the original Senate resolution; but that is not the question in this case in determining the validity of the proposal, nor are we dealing with the question of presumption to determine whether or not the two houses of the General Assembly agreed upon the same proposal. The real question is whether the omission from the

Senate journals of the House amendment and the substantial difference between the amendment entered on the journal of the Senate and the one submitted to the people renders the adoption by the people ineffectual.

At an early date in the history of the State it was decided by this court in *State* v. *Cox,* 8 Ark. 436, that in amending the Constitution the General Assembly "does not act in the exercise of its ordinary legislative authority of its general powers, but it possesses and acts in the character and capacity of a convention." This doctrine was repeated in the recent cases of *Whittemore* v. *Terral,* 140 Ark. 493, and *Mitchell* v. *Hopper,* 153 Ark. 515. In the last-cited case we decided that it is not essential that a resolution of the General Assembly proposing an amendment to the Constitution be submitted to the Governor for approval, and that the Governor has no power under the Constitution to veto such a resolution. In the case of *Rice* v. *Palmer,* 78 Ark. 442, the court quoted with approval the language of another court in announcing fundamental principles which must be controlling in the present inquiry. That language is as follows:

"The Constitution is the supreme and paramount law. The mode by which amendments are to be made under it is clearly defined. It is said that certain acts are to be done, certain requisitions are to be observed before a change can be effected. But to what purpose are these acts required or the requisitions enjoined, if the Legislature or any other department of the government can dispense with them? To do so would be to violate the instrument they are sworn to support; and every principle of public law and sound constitutional policy requires the court to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law." *Collier* v. *Frierson,* 24 Ala. 108.

We find, in fact, from an examination of the authorities that they are unanimous, with two excep-

tions, in holding that provisions of the Constitution with reference to the method of adopting amendments are mandatory and must be complied with in order to amend the Constitution. The only conflict in the authorities is in the interpretation of certain requirements, particularly the one now under consideration, to be found in most Constitutions, to the effect that proposals submitted by the Legislature shall be entered on the journals. The only exceptions to this rule are found in the *Prohibitory-Amendment Case,* 24 Kan. 700, to which we will later advert, and in the case of *West* v. *State,* 50 Fla. 154, where it was held that the constitutional provision in question was merely directory. It follows, therefore, from the overwhelming weight of authority that, if the language of our Constitution be interpreted to mean that a proposal of an amendment to the Constitution must be entered in *extenso* on the journal of each of the Houses, this amendment was not legally adopted, for it is clear that the amendment submitted to and voted on by the people was not the same in substance as that found to be entered at large on the journals of the Senate.

The authorities bearing on an interpretation of the language in other constitutions identical with, or similar to, that found in the Constitution of this State concerning the method of proposing amendments are not harmonious, nor are they very abundant. There are many decisions referring to the question of legal methods of proposing and adopting constitutional amendments, but when we come down to the very question involved in this case the authorities are not numerous, and in several of the States the decisions of the courts of last resort are hopelessly conflicting. In a note to a case in 9 Am. & Eng. Ann. Cas, we find, on page 587, the following statement of the law:

"A distinction has been drawn between the rules governing acts proposing constitutional amendments and those applying to ordinary statutes which are assailed as not having been constitutionally enacted. Where it

is provided in the Constitution that "any amendment or amendments to this Constitution may be proposed in the Senate or Assembly, and if two-thirds of all the members elected to each of the two houses shall vote in favor thereof, such proposed amendment or amendments shall be entered in their journals with the yeas and nays taken thereon, and it shall be the duty of the Legislature to submit such proposed amendment or amendments to the people," etc., it is held that the journal must show the amendment and vote thereon, and that the court will look to the journals to ascertain if the proper steps were taken. It is further held that the journal is the record from which it must appear that the amendment has been enacted in the form required by the Constitution, and that the rule whereby a statute which has been enrolled, authenticated, and deposited with the Secretary of State cannot be impeached by reference to the legislative journals has no application."

The cases holding that this constitutional requirement is satisfied merely by an entry which sufficiently identifies the proposal by reference to title, or otherwise, seem to be in the majority. *Prohibitory-Amendment Cases,* 24 Kan. 700; *Worman* v. *Hagen,* 78 Md. 152; *Oakland Paving Co.* v. *Tompkins,* 72 Cal. 5; *People* v. *Sours,* 31 Colo. 369; *State* v. *Herriad,* 10 S. D. 109; *Postel* v. *Marcus,* 160 Wis. 354; *Ex parte Ming,* 42 Nev. 472; 181 Pac. 319, 6 A. L. R. 1216. There is a case note in 6 A. L. R. 1227, which fully reviews the authorities on this subject. On the other hand, there are cases holding that where the language of the Constitution requires that a proposed amendment shall be "entered on the journals," this language means that it must be entered *in extenso* and not merely by reference to title, or otherwise, and that an omission to strictly comply with the provision invalidates the proposal. *Koehler* v. *Hill,* 60 Ia. 543; *Bailey* v. *Brookhart,* 113 Ia. 250; *People* v. *Loomis,* 135 Mich. 556; *Durfree* v. *Harper,* 22 Mont. 354; *In re Senate File,* 24 Neb. 864. It is thus seen that the

two conflicting rules of interpretation are supported by respectable authority, and we feel at liberty to adopt that line of authority which is consistent with our own conception of the better reasoning on the subject, and that which appears to us to have been the intention of the framers of this provision of our Constitution, when read and considered in connection with other provisions thereof.

The decision of the Supreme Court of Kansas in the *Prohibitory Amendment Cases, supra,* is generally cited as the chief exponent of the doctrine that a mere identifying reference on the journals of the General Assembly is sufficient to satisfy the requirement that the proposed amendment must be "entered on the journals." The opinion in that case was written by Judge Brewer and for that reason, if for no other, commands the utmost respect. The opinion, however, is much weakened by the fact that it is out of line with the almost unanimous authority in holding that a provision of this kind is not mandatory but merely directory. In fact, it was not decided in that case by the distinguished jurist that the words, "shall be entered on the journal," meant that a mere identifying reference to the amendment could be entered on the journal and was sufficient compliance with that language, but he held that the requirement was merely directory, and that the will of the people as expressed at the ballot box could not be overthrown by a failure on the part of the Legislature or of its agents to enter the proposed amendment on the journals. He propounds the inquiry, "Is the failure to enter this amendment at length on the journals fatal?" and answers it by stating that the "two important, vital elements in any constitutional amendment are, the assent of two-thirds of the Legislature, and a majority of the popular vote," and that a failure to comply with the provision with reference to making the proper record of the legislative proceeding does not defeat the amendment, which has in fact been proposed by two-thirds of the General Assembly and adopted by the votes of a majority of the

people. Notwithstanding the learning and ability of that great jurist who wrote that opinion, it is so far out of line with all of the other adjudged cases on the question upon which the decision rests, that we must discard it as a controlling authority in interpreting the meaning of the language of our Constitution.

The Supreme Court of Wisconsin in the case of *Postel* v. *Marcus, supra,* first decided that the requirement for entering a proposed amendment on the journal of each house meant that it should be entered *in extenso,* and not merely by reference to title or otherwise. The opinion was written by Judge Marshall, but on rehearing the decision was changed, and it was held that an identifying reference on the journals was sufficient. It appears that the original decision of the court resulted in invalidating about twenty-five important constitutional amendments reaching back for many years, and that this fact had its influence on the court in changing the opinion. We feel at liberty in thus commenting on the decision from the fact that this situation in which the court found itself is fully disclosed in the opinions on rehearing, not only that of the Chief Justice, who wrote the additional opinion, but also the dissenting opinion of Judge Marshall and the concurring opinion of another of the justices.

It will be observed that the case of *Koehler* v. *Hill,* 60 Iowa 543, and the case of *Worman* v. *Hagen, supra,* which are conflicting on this question, were both reviewed by this court in *Rice* v. *Palmer, supra,* and the doctrine of the Maryland case was condemned and the doctrine of the Iowa case approved. It is true the discussion arose over another point, but it related to the question of the adoption of constitutional amendments, and the opinion of our court in *Rice* v. *Palmer* shows that the attitude of the Maryland court on that subject did not meet with the approval of this court. The language in the Constitution of the State of Iowa with respect to amendments is almost identical with our Constitution as to the provision requiring the

entry of proposed amendments on the journals of the General Assembly. The Supreme Court of that State in *Koehler* v. *Hill, supra,* said:

"The evident intent of the Constitution is that the proposed amendment should be entered at length on the journal, or, at least, so entered as to leave no reasonable doubt as to its provisions. This must be so, or the entering of the yeas and nays can be as readily dispensed with as entering the resolution, and yet this is the constitutional mode of ascertaining whether a majority of the members elected to each house agreed to the amendment. * * * It seems to us that a simple entering on the journal of the title or object of a proposed amendment does not accomplish the intent of the Constitution, and the thought that this must be so is much strengthened when regard is had to all the provisions of the Constitution. That instrument provides that upon the final passage of a bill the yeas and nays must be taken, and the same entered upon the journal. This necessitates the entering on the journal of the title or substance of the bill to be voted upon. This being so, if no more than this was intended in relation to a constitutional amendment, the provision as to entering it on the journal is unnecessary and meaningless. There is no provision requiring a bill to be entered on the journal, but the Constitution does require that a proposed amendment thereto 'shall be entered' on the journals 'with the yeas and nays.' This must mean that the amendment shall be spread at length thereon, and the yeas and nays set out in the journal in full or at length. No distinction between the two can possibly be drawn."

The reasoning of the court in that case precisely fits the present situation under our own Constitution. The Constitution of 1874 (art. 5, § 12) provides: "* * * Each house shall keep a journal of its proceedings, and from time to time publish the same, except such parts as require secrecy; and the yeas and nays on any question shall, at the desire of any five members, be entered on the journals." The only requirements in the Con-

stitution with respect to what shall be entered on the journals is the one under consideration with reference to amendments, and the one in § 22, art. 5, that "no bill shall become a law unless on its final passage the vote be taken by yeas and nays, the names of the persons voting for and against the same be entered on the journal, and a majority of each house be recorded thereon as voting in its favor;" and the one in § 15, art. 6, that, in case the Governor vetoes a bill, "he shall return it, with his objections, to the house in which it originated, which house shall enter the objections at large upon their journal and proceed to reconsider it."

It was necessarily assumed by the framers of the Constitution that, so far as concerned the enactment of statutes, the journals should contain some reference to the passage of bills through the two houses so as to identify them and show the course of the proceedings—this without any special requirement to that effect. If the framers of the Constitution had intended that nothing more than that was to be required concerning amendments to the Constitution, it would have been unnecessary to put in the additional requirement that amendments shall be "entered on the journals." It will also be observed that the requirement of the Constitution is not merely that the proceeding in regard to proposed amendments shall be entered on the journals—not merely a history of the passage of the proposal through the houses be entered—but it provides that the amendment itself shall be entered on the records. The precise language is that "such proposed amendments shall be entered on the journals with the yeas and nays." It is our duty to give some meaning to the language of the Constitution, and not to presume that this provision was put in merely as a well-rounded phrase. As said by the Iowa court in *Koehler* v. *Hill*, there is as much reason to hold that it was not necessary to enter the yeas and nays at large on the record as it was to hold that it was unnecessary to enter the amendment at large.

We have decided that the provision in § 22, art. 5, requiring the yeas and nays to be entered on the journal on the final passage of a bill is mandatory, and that the omission renders an enactment void. *Smithee* v. *Garth,* 33 Ark. 17: *State* v. *Bowman,* 90 Ark. 174; *Butler* v. *Board of Directors,* 103 Ark. 109. Our conclusion is that the proposal of an amendment to the Constitution is void unless the amendment is entered *in extenso* on the journals of each of the two houses of the General Assembly, and that a mere identifying reference by title or otherwise is insufficient. We do not mean to hold that it is essential to the validity of a constitutional amendment that the entire proposal as it may be affected by amendments adding or subtracting language in the course of its progress through the two houses must be spread upon the journal of either house at the same place or at the same time. Different parts of the journals of the respective houses may, if connected up so that the whole of the amendment as finally adopted by both houses, appears upon the journal of each house, be treated as sufficient to make a complete record; but we do hold that where any substantial part of the amendment is omitted entirely from the journal of either one of the houses, even though it appears on the journal of the other house, it renders the proposal invalid. By way of illustration, we might take the journal of the House in this instance, which shows the original resolution as introduced in the Senate was spread at large upon the journal, and there were certain amendments which were also separately spread on the journal. Now, if the House had adopted the amendment by a yea and nay vote spread on the record without actually re-entering the amended resolution, that would have been sufficient, because the original Senate resolution and the House amendment are connected together, so that it is in effect a complete entry of the whole amendment as adopted by the House. But when we come to the Senate journal, we find nothing there but the entry of the original resolution. If the journal of the Senate had contained a recital of the House

amendments and a corrected copy of the same was entered on the journal, an adoption of the amendment would have shown the whole of the resolution that the Senate adopted, and it would have been unnecessary to re-enter the original resolution as amended. The two entries, in other words, would have been sufficient; but, as the journal entry now stands, there is no disclosure whatever on the Senate journal of the House amendment, therefore the Constitution has not been complied with. Nor do we mean to say that a compliance with this provision must be absolutely literal. On the contrary, we say that the omission of an immaterial portion of an amendment—one not affecting its meaning or interpretation—would not affect its validity. It is only a substantial omission from the record which is fatal, and not merely immaterial words which do not affect the real meaning of the proposal. It is easily seen that the House amendments are substantial, and that the omission of them from the journal is an important departure from the text of the proposal as amended by the house.

There is one portion of Judge Brewer's opinion in the Kansas case, *supra,* in which we heartily concur, and it is this: "But questions of policy are not questions for the courts. They are wrought out and fought out in the Legislature and before the people. Here the single question is one of power. We make no laws; we change no constitutions; we inaugurate no policy. When the Legislature enacts a law, the only question we can decide is, whether the limitations of the Constitution have been infringed upon. When a constitutional amendment has been submitted, the single inquiry for us is, whether it has received the sanction of popular approval in the manner prescribed by the fundamental law. So that, whatever may be the individual opinions of the justices of this court as to the wisdom or folly of any law or constitutional amendment, and notwithstanding the right which as individual citizens we may exercise with all other citizens in expressing through the ballot box our personal approval or disapproval of proposed

constitutional changes, as a court, our single inquiry is, have constitutional requirements been observed, and limits of power been regarded? We have no veto. The judge who casts his individual opinions of wisdom or policy into the decision of questions of constitutional limitations and powers, simply usurps a prerogative never committed to him in the wise distribution of duties made by the people in their fundamental law.''

This ends our discussion of the question of the validity of proposed amendment No. 12, and we hold that it is void on account of the failure of the General Assembly to enter the proposal in accordance with the express mandate of the Constitution. It is unnecessary to discuss the questions raised in the case as to what the effect of the amendment would have been with respect to being self-executing as a limitation upon the action of the Legislature and with respect to what constitutes local legislation within its meaning.

There is, however, another question in the case which calls for discussion. It is contended that the statute under consideration is void for the reason that it authorizes a wrongful diversion of funds of an improvement district.

Road Improvement District No. 2 of Craighead County was created by a statute enacted by the General Assembly of 1919 (Road Acts 1919, vol. 1, p. 174) for the purpose of improving a public highway running from the city of Jonesboro to the line between Craighead and Lawrence counties. There was authority in the statute also to improve a lateral road which connected with the main line. The main line of the improved road crossed Cache River, and at the time of the formation of the original plans there was a bridge across the river, which it was thought would last for some years, and plans omitted re-construction of a bridge. The road was constructed without a new bridge, and assessments were levied and bonds issued. It now becomes necessary to build a bridge across Cache River, and the General Assembly of 1925 enacted the special statute now under

consideration authorizing the construction of a bridge
across Cache River at a cost of not exceeding $20,000,
and providing that the board of commissioners of the
road improvement district could use the sum of $4,500
of the funds of the district in the construction of the
bridge, the remaining portion of the cost to be paid out
of federal aid and out of State aid funds to be distrib-
uted by the State Highway Commission. The statute
provides that the plans for the improvement must be
approved by the county court, and the work of con-
structing the bridge "may be done directly through the
joint action of the county court and board of commis-
sioners of said district and the State Highway Depart-
ment by purchasing material and employing labor, or
they may at their option let a contract to a contractor to
construct said bridge." It is shown that this contribu-
tion from the funds by the district can be made without
an additional assessment on the lands and without diver-
sion of funds needed to pay off the bonds of the district.
The contention of counsel for appellees is that the con-
tribution of funds authorized by this statute would oper-
ate as a diversion or misappropriation of funds in
violation of that provision of the Constitution (art.
16, § 11) that "no moneys arising from a tax levied
for one purpose shall be used for any other purpose."
Counsel rely on the decision of this court in *Paving Dis-
trict No. 5 of Fort Smith* v. *Fernandez,* 142 Ark. 21.
That case, we think, has no application to the case now
before us, for it involved the legislative authority to
reappropriate funds of a municipal improvement dis-
trict, and the basis of our decision in that case was that
the consent by the owners of property to the construction
of the original improvement being necessary under the
Constitution (art. 19, § 27), funds arising from taxes
levied on benefits could not be used for any other purpose
without the consent of the owners of the property. Upon
the same principle we decided in the case of *Bauer* v.
*North Arkansas Highway Improvement District, ante* p.
220, that property owners in a local improvement district

had an interest in the funds of the district, and that it was an impairment of their vested rights for the Legislature to enact a law to divert the funds to uses other than for the benefit of the owners. Neither of those cases has any bearing on the present controversy, unless it be held that the bridge sought to be constructed is an independent improvement. Cache River is a small, non-navigable stream at that place, and we do not think that it can be treated as an improvement which is necessarily one independent of the road district. This statute constitutes a legislative determination that the particular bridge is not an independent project, but is a part of the construction of the road. We are not at liberty to set aside the legislative finding unless it appears to be demonstrably arbitrary and unwarranted. *Bennett* v. *Johnson,* 130 Ark. 507. We have held in former decisions that the Legislature cannot join to a road improvement district, as part of the same unit, the construction of a bridge which necessarily constitutes a separate project, but that it is within the power of the Legislature to authorize the construction of bridges which are merely incidental to the improvement of a road. *Mack* v. *Paragould-Hopkins Bridge Road Imp. Dist.,* 168 Ark. 867; *Van Dyke* v. *Mack,* 139 Ark. 524; *Bullock* v. *Dermott-Collins Road Imp. Dist.,* 155 Ark. 176; *Wimberly* v. *Road Imp. Dist.,* 161 Ark. 161. If the Legislature had in the beginning found that the construction of a bridge was part of the same project of improving the highway and authorized the road improvement district to construct the bridge, it was still within the power of the Legislature, even though the road itself had been completed, to join to it the improvement which could have been included in the beginning, and to do so does not constitute a diversion of funds. In other words, the addition of this improvement is, in effect, the same as if it had been included in the beginning, and the use of funds arising from taxes levied on the benefits to real property does not constitute an impairment of vested rights or a diversion of funds of property owners to uses other than for their

own benefit. Section 11, art. 16, of the Constitution, providing that "no moneys arising from a tax levied for one purpose shall be used for any other purpose," has no application to the statute now under consideration, as that provision applies only to general taxation and not to local assessments.

It follows from the views we have expressed that the statute under consideration is valid; so the decree is reversed, and the cause is remanded with directions to dismiss the complaint for want of equity.

WOOD and HUMPHREYS, JJ., dissent.