W.J. "Bill" McCUEN, Mary Klaser and the Natural State
Committee, on Their Own Behalf and on Behalf of All Those
Persons Who Have Volunteered Time and Contributed
Financially to the Campaign for Proposed Amendment 2,
Nick Wilson, Vic Snyder, and Mark Pryor *v.* Clarence HARRIS

94-1196                                          902 S.W.2d 793

Supreme Court of Arkansas
Opinion delivered July 17, 1995

460

*Winston Bryant*, Att'y Gen., by: *Timothy Humphries* and *Angela Jegley*, Asst. Att'y's Gen., for appellant.

*Bowden Law Firm*, for appellee.

ROBERT L. BROWN, Justice. This is an appeal from a preliminary injunction granted by the Pulaski County Chancery Court. The injunction prevents then Secretary of State, W.J. "Bill" McCuen, from canvassing and counting votes on Proposed Amendment 2, which proposed to levy a one-eighth of one percent tax on all taxable sales of property. We refused to expedite consideration of this appeal by per curiam order on November 4, 1994. *See McCuen* v. *Harris*, 318 Ark. 522, 891 S.W.2d 350 (1994) (Harris I). The appellants are comprised of McCuen and campaigners and intervenors, including Mary Klaser and the Natural State Committee, State Senator Nick Wilson, State Senator Vic Snyder, and State Representative Mark Pryor. They raise numerous issues on appeal which center on the propriety of a preliminary injunction so close to the election. We affirm the chancery court.

On October 19, 1994, Harris filed his petition to enjoin McCuen, as Secretary of State, from (1) taking any action to place Proposed Constitutional Amendment 2 on the Ballot for the November 8, 1994 General Election, and (2) from counting votes cast for the proposed amendment. The Harris petition followed two days after this court's decision in *Walmsley* v. *McCuen*, 318 Ark. 269, 885 S.W.2d 10 (1994), where we held that McCuen as Secretary of State had failed to comply with the publishing requirement of Article 19, § 22 of the Arkansas Constitution in connection with Proposed Amendment 3 relating to lotteries and bingo. The reason stated for the injunction in the Harris petition was the same failure of the Secretary of State to follow the publishing requirements of Article 19, § 22. On October 26, 1994, Harris filed a motion for a preliminary injunction and requested that votes not be counted pending a decision on the merits.

On November 2, 1994, the Harris petition was heard by the

chancery court. On November 3, 1994, the court entered an order reciting findings of fact which we paraphrase below:

(1) Harris is a taxpayer and registered voter in Arkansas.

(2) On May 6, 1994, the Secretary of State published a public notice of Amendment 2 which contained only the popular name and ballot title of the amendment. A similar publication was made in September 1994 and two more publications were made in October 1994. The entire text of the amendment was sent for publication in all 75 counties on October 30, 1994.

(3) Private contributions to support the campaign for Amendment 2 totaled $181,085.36. Of that amount, $109,557.95 was contributed since August 8, 1994. A total of $125,000 was spent by the Natural State Committee.

(4) A total of 11,153 volunteer hours was contributed in support of Amendment 2, with the majority of those hours contributed in September and October 1994.

(5) Much of this time and money would not have been donated had the Harris petition been filed earlier.

(6) If Amendment 2 passed, the State of Arkansas could anticipate collecting approximately $36.28 million in fiscal year 1995-96 and $37.56 million in fiscal year 1996-97. That money would be irretrievably lost and would have gone to various state agencies and commissions for the preservation of natural resources, wildlife, and historical articles and buildings. There was credible testimony that the State will be irreparably harmed by loss of these revenues.

(7) Harris is 70 years old, lives on a fixed income of $2,000 per month and would pay some amount less then $563 in sales taxes under Amendment 2 during the remainder of his life. Intervenor Natural State Committee offered to post a bond in the amount of $563 to protect Harris.

The chancery court then reached conclusions which we paraphrase:

(1) Regarding the manner of publication, there is no distinction between this case and *Walmsley* v. *McCuen, supra.*

(2) The considerations pertaining to whether to grant a preliminary injunction are different from the *Walmsley* case in that the State has shown that irrevocable harm will occur if the injunction is improvidently granted, and intervenors Klaser and the Natural State Committee have shown that they were prejudiced in terms of time and money contributed due to the delay in filing the Harris petition.

(3) Unlike commercial litigation, the court did not believe that laches applies when the plaintiff seeks to enforce a constitutional obligation of the Secretary of State to publish a proposed amendment as required by Article 19, § 22.

(4) Harris will not be irreparably harmed by the amount of taxes paid if Amendment 2 passed but has established irreparable harm in that election procedures are mandatory before an election and directory after an election and inasmuch as no monetary value can be placed on his right to enforce the publication requirement under Article 19, § 22.

(5) A bond exceeding $70 million would be impossible for Harris to post and would not be appropriate in the context of his seeking to enforce the provisions of the Arkansas Constitution.

(6) Based on the *Walmsley* case and the court's opinion that laches does not apply, Harris has an extremely high likelihood of success on the merits.

(7) The harm to Harris from not granting the injunction exceeds the harm to the State and intervenors from granting it.

(8) The argument of the legislators, as intervenors, that the injunction grants the Secretary of State a veto power over the General Assembly's right to refer proposed constitutional amendments is overruled.

(9) The argument of McCuen and the intervenors that the preliminary injunction should not issue because its effect will be irreversible is overruled.

The court preliminarily enjoined the Secretary of State from canvassing returns and counting the votes on Amendment 2 and refrained from requiring Harris to post a bond.

*I. Subject Matter Jurisdiction*

■ Though neither party has raised the issue of subject matter jurisdiction, we can investigate such jurisdiction on our own. *Coran v. Keller*, 295 Ark. 308, 748 S.W.2d 349 (1988). We hold that jurisdiction exists in chancery court in this case.

Article 19, § 22 of the Arkansas Constitution provides the process for proposed amendments to the constitution adopted by the General Assembly. There are certain requirements for these amendments under Article 19, § 22: (1) they must be adopted at a regular session of the General Assembly, (2) a majority of the members of each house must agree, (3) the amendments and the yeas and nays must be entered on the journals of each house, and (4) the amendments must be published by the Secretary of State for six months.

In *Walmsley v. McCuen, supra*, the appellant appealed from Pulaski County Chancery Court and sought the same relief as that requested in the Harris petition based on the Secretary of State's failure to publish the proposed amendment for six months, as required by Article 19, § 22 of the Arkansas Constitution. The chancery court in *Walmsley* had found compliance with the publishing requirement of Article 19, § 22. We reversed the chancery court and held that the Secretary of State had not complied with the publishing requirement. No question of subject matter jurisdiction was raised by this court or any party.

■ This court has considered multiple cases over the years where the issue involved was whether full compliance with Article 19, § 22 had been attained, all of which were appeals from chancery court. *Becker v. Riviere*, 277 Ark. 252, 641 S.W.2d 2 (1982); *Wells v. Riviere*, 269 Ark. 156, 599 S.W.2d 375 (1980); *Jernigan v. Niblock*, 260 Ark. 406, 540 S.W.2d 593 (1976); *Bryant v. Rinke*, 252 Ark. 1043, 482 S.W.2d 116 (1972). In none of these cases was subject matter jurisdiction ever challenged. In *Becker*

v. *Riviere*, the issue was the purpose of a ballot title for Article 19, § 22 amendments. This court refused to enjoin certification of the ballot title. In *Wells* v. *Riviere*, the suit was to prevent the Secretary of State from placing three Article 19, § 22 amendments on the ballot because they had not been adopted in a *regular* session of the General Assembly. This court agreed that the amendments should not be placed on the ballot. In *Jernigan* v. *Niblock*, the suit was to prevent the Secretary of State from certifying an Article 19, § 22 amendment to election officials because the yeas and nays had not been appropriately recorded. We affirmed the chancellor's injunction and made it permanent. And in *Bryant* v. *Rinke*, the issue also was the failure of the yeas and nays to be appropriately recorded for an Article 19, § 22 amendment. Again, we agreed that the Secretary of State should be enjoined from publishing those amendments. In two other cases, this court entertained appeals from chancery court for alleged irregularities in Article 19, § 22 constitutional amendments, even though the election had already been held. *See Chaney* v. *Bryant*, 259 Ark. 294, 532 S.W.2d 741 (1976); *McAdams* v. *Henley*, 169 Ark. 97, 273 S.W. 355 (1925).

The dissent cites little authority to support its conclusion that only circuit court jurisdiction was appropriate. It cites one case where we held that mandamus was the proper method for removing an ineligible candidate from the ballot under Ark. Code Ann. § 7-5-207 (Repl. 1991). *See State* v. *Craighead County Bd. of Election Comm'rs*, 300 Ark. 405, 779 S.W.2d 169 (1989). That case and statute have nothing to do with Art. 19, § 22 amendments. The dissent then adduces several cases to support its notion that chancery court has no jurisdiction when the issue is what procedures are to be followed in conducting a political election. None of these cases deals with a constitutional amendment proposed under Art. 19, § 22. Indeed, as already indicated, a line of authority extending back several decades supports equitable jurisdiction for cases of this ilk where failure to comply with Art. 19 § 22 is the issue. In short, the dissent provides no authority to support its theory of circuit court jurisdiction, where an Art. 19, § 22 deficiency is involved.

Indeed, *Catlett* v. *Republican Party of Arkansas*, 242 Ark. 283, 413 S.W.2d 651 (1967), was a dispute involving political parties over statutory procedures to be followed in political elec-

tions. Enforcement of political rights under the election laws was not deemed to be a matter for chancery court. Here, however, the issue is the failure of the Secretary of State to comply with the dictates of Art. 19, § 22 of the Arkansas Constitution in publishing the amendment and an injunction to prohibit placement of that amendment on the ballot. Again, such matters have exclusively been brought in chancery court.

■ Our chancellors and prospective parties like Harris could only conclude in light of *Walmsley* v. *McCuen*, its progeny, and the history of challenges under Art. 19, § 22, that jurisdiction lay in chancery court.

## II. Mootness

■ Similarly, before we address the appellants' issues, we consider Harris's contention that this case is moot due to the fact that the November 8, 1994 General Election has already been held. The appellants urge that the issues raised in this appeal are ones of great importance to the general public and should be decided even if moot. *See Netherton* v. *Davis*, 234 Ark. 936, 355 S.W.2d 609 (1962). We agree that because this case involves issues surrounding an election on a constitutional amendment referred by the General Assembly, we should decide the issues. There is also the fact that appellants ask for a dissolution of the preliminary injunction against counting the ballots. The effect of such a dissolution is unknown, but that request for relief renders the case viable.

## III. Preliminary Injunction

We turn then to the appellants' principal argument which is that Harris impermissibly delayed the filing of his petition until three weeks before the General Election and is guilty of laches.

■ An order granting or denying a preliminary injunction is within the chancery court's discretion. *Smith* v. *American Trucking Ass'n*, 300 Ark. 594, 781 S.W.2d 3 (1989); *American Trucking Ass'n* v. *Gray*, 280 Ark. 258, 675 S.W.2d 207 (1983). This court will not reverse the granting of a preliminary injunction unless there has been an abuse of the chancellor's discretion. *Smith* v. *American Trucking Ass'n, supra*; *Scrivner* v. *Portis Mercantile Co.*, 220 Ark. 814, 250 S.W.2d 119 (1952); *Riggs* v. *Hill*, 201 Ark. 206, 144 S.W.2d 26 (1940).

■ We believe that the chancery court's analysis of the laches issue was correct. While we do not dispute the appellants' suggestion that the *Walmsley* case was the catalyst for the Harris petition, we cannot conclude that the doctrine applies in a matter where a plaintiff seeks to enforce his constitutional right to be fully informed on a proposed constitutional amendment. As the chancery court appropriately noted, the *Walmsley* case decides the issue that the Secretary of State failed to comply with the publishing mandates set out in Article 19, § 22.

The appellants cite us to two cases in support of their laches theory — *Ellis* v. *Hall*, 221 Ark. 25, 251 S.W.2d 809 (1952) (plurality opinion) and *Becker* v. *McCuen*, 303 Ark. 482, 798 S.W.2d 71 (1990). Neither case decides the laches question. The *Ellis* case concerned a petition on a referred Act under Amendment 7 to the Arkansas Constitution. A Commissioner's report on the sufficiency of the required signatures showed the number to be approximately 1,400 short of the required number. In a plurality decision, three members of this court refused to strike the matter from the ballot on the basis of a *prima facie* report and further concluded that the remaining time before the General Election was insufficient for a completion of proof. In the instant case, however, proof of failure to publish in accord with Article 19, § 22 and this court's decision in *Walmsley* v. *McCuen, supra,* was beyond dispute. Accordingly, the asserted constitutional deficiency was not a *prima facie* matter.

In *Becker* v. *McCuen, supra,* the petition contesting the proposed constitutional amendment (the "Interest Rate Amendment") by the legislature contended that the popular name and ballot title, as published and certified, were misleading and deceptive. We declined to strike the matter from the ballot because the petitions had not sought to have the Secretary of State correct his order previously and had waited until the eleventh hour to do so. Although there was a mistake in the publication and certification of the ballot title by the Secretary of State, we held that there was substantial compliance. We went on to state that if the Secretary of State's action caused prejudice to either side, it would be proper to strike the matter from the ballot. The facts in *Becker* are vastly different from those in the instant case. Here, the Secretary of State failed to comply with the six-month publication of the entire amendment as required by Article 19, § 22,

and the chancery court found that Harris had been irreparably harmed by this failure.

The appellants also contest the chancery court's finding that Harris would be irreparably harmed without the injunction and that he had no adequate remedy at law. They hinge their arguments on the minimal monetary expense at issue — $563 — that Harris would incur from the proposed tax. That is not the issue, however. The right to be fully and adequately informed of constitutional amendments referred by the General Assembly is inherent in the six-month publication requirement of Article 19, § 22. The constitutional mandate was violated in this case. No monetary value can be placed on the resulting prejudice. For this reason, the chancery court was correct in finding that the harm that would accrue to Harris by not granting the injunction outweighed the harm that would accrue to the appellants by granting it. Moreover, we observe no error in the chancery court's refusal to require a $70 million bond of Harris. To have done so would have effectively foreclosed his right to a preliminary injunction and protection of his constitutional rights.

There is, lastly, the point raised that the chancery court's ruling gives the Secretary of State veto power over proposed amendments under Article 19, § 22. That argument presupposes an intentional act by the Secretary of State to thwart the will of the General Assembly in adopting proposed amendments. There is no evidence that that occurred in the case before us. Indeed, the Secretary of State was undoubtedly attempting, in the publication of Amendment 2, to comply with certain statutes passed by the General Assembly, as was the case in *Walmsley* v. *McCuen, supra*. We, therefore, resist the temptation to decide hypothetically the effect that willful interference by the Secretary of State would have on the balance of power among the three discrete branches of government. We simply do not see this decision today as precedent for sanctioning a "veto power" by the Secretary of State over legislative amendments, as the intervenors suggest.

In sum, this is not a case where a dollar amount can be placed on the right of Harris to be fully apprised of a proposed constitutional amendment. Though, admittedly, the work and money of many volunteers and contributors who supported

Amendment 2 came to naught, amending the constitution is a precise science which entails complete information flowing to the electorate.

There was no abuse of discretion by the chancery court in granting the preliminary injunction.

Affirmed.

Special Justice WINSLOW DRUMMOND joins in this opinion.

HOLT, C.J., DUDLEY and GLAZE, JJ., dissent.

ROAF, J., not participating.

JACK HOLT, JR., Chief Justice, dissenting. I respectfully dissent. The ultimate issue before this court is whether the Pulaski Chancery Court has authority or jurisdiction to interpose equity in matters relating to the procedures to be followed by the Secretary of State in publishing notice relating to the conduct of a political election, or, stated another way, can equity jurisdiction be interposed for the protection of rights which are merely political, and be invoked for the purpose of restraining the holding, directing or controlling the mode, or determining the rules of law concerning how an election shall be held. I disagree that the chancery court had jurisdiction over the election procedures in question, and would order its injunction dissolved.

Granted, the jurisdictional issue was not raised by the appellants or the appellee. However, the question of subject matter jurisdiction is always open and may be raised by the court, even if not raised by the parties. *Coran* v. *Keller*, 295 Ark. 308, 748 S.W.2d 349 (1988). In fact, we not only have the right, but the duty to raise this issue. *Arkansas State Employees Ins. Advisory Comm'n* v. *Estate of Manning*, 316 Ark. 143, 870 S.W.2d 748 (1994).

In *Catlett* v. *Republican Party of Arkansas*, 242 Ark. 283, 413 S.W.2d 651 (1967), the Republican Party filed an action in chancery court seeking declaratory relief. The chancery court found unconstitutional Act 477 of 1963 which prohibited the majority party member of the county board of election commissioners from naming members of the majority party as election officials. The chancellor also found invalid Act 56, § 5 of the Extraordinary Session of 1965, which prohibited persons having

voted in a party primary from being designated by an opposite party to serve in the next general election. And finally, the chancellor declared Act 57 of the same extra session, an act making it a felony to vote in more than one party primary on the same day, inapplicable to persons voting in a general election. This court refused to reach the merits of the issues decided by the chancery court, stating the following:

> Wherever the established distinction between equitable and common law jurisdiction is observed, as it is in this State, courts of equity have no authority or jurisdiction to interpose for the protection of rights which are merely political, and where no civil or property right is involved. In all such cases, the remedy, if there is one, must be sought in a court of law. The extraordinary jurisdiction of courts of chancery can not, therefore, be invoked to protect the right of a citizen to vote or to be voted for at an election, or his right to be a candidate for or to be elected to any office. *Nor can it be invoked for the purpose of restraining the holding of an election, or of directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held.* These matters involve in themselves no property right, but pertain solely to the political administration of government.

242 Ark. at 285. (Emphasis added.)

In sum, the *Catlett* court held that a court of equity cannot invoke its jurisdiction for the purpose of restraining, directing or controlling the mode in which, or of determining the rules of law in pursuance of which, an election shall be held. In *Catlett*, we further stated that it is immaterial that the parties have not raised the issue of jurisdiction, for as we held in *Sheffield* v. *Heslep*, 206 Ark. 605, 177 S.W.2d 412 (1944), even though both sides to the litigation had asked this court to pass on the eligibilty of *Heslep*, nevertheless "we cannot do so in this equitable action, because there is no foundation for equitable jurisdiction." The same rings true in this case, for here there is no foundation for equitable jurisdiction. *See also White* v. *Holmes*, 302 Ark. 545, 790 S.W.2d 902 (1990).

The *Catlett* decision makes it clear that the chancery court

has no authority to decide election or political rights issues such as the ones presented in this case. Harris's entire request for relief deals with the rules of law by which a constitutional issue is placed on a general election ballot. In seeking relief, he asked the chancery court to construe the laws governing election matters in a mandatory manner before the November 8, 1994 General Election was held so the proposed constitutional amendment would not be placed on the ballots or would not be counted or canvassed by the election officials. Obviously, the central focus of this case involves not only the direction and control of the mode of holding an election, but also affects the citizens' rights to vote at that election. The chancery court clearly had no power to invoke its jurisdiction in such election matters or political rights issues.

When the jurisdictional problem was addressed during the oral arguments, two reasons emerged why we should not follow our traditional rule of keeping such election matters within the exclusive province of circuit court. The first concerns the provision of the Arkansas Civil Rights Act of 1993, which allows suits in equity. The second relates to our recent decision in the virtually identical case of *Walmsley* v. *McCuen*, 318 Ark. 269, 885 S.W.2d 10 (1994), wherein the issue of jurisdiction was not raised by the parties, and we likewise failed to examine the jurisdiction of the chancellor. In *Walmsley*, the chancellor declined to issue an injunction directed to Secretary of State McCuen, and, on appeal, we reversed the chancellor and remanded the case for entry of the injunction which was sought. In doing so, we were in error, as the chancery court did not have jurisdiction of the election issue. There is no legitimate reason for *Walmsley* to stand, as doing so would be to abort the longstanding exclusivity of circuit court in election cases.

In addition, the Arkansas Civil Rights Act does not establish jurisdiction in chancery court in this case. The Act, codified at Ark. Code Ann. §§ 16-123-101 to 109 (Supp. 1994), was invoked by Mr. Harris in his quest for injunctive relief. Section 16-123-103(a) provides that a governmental entity or person who, under color of law, deprives any person of rights, privileges and immunities secured by the Arkansas Constitution, shall be liable "in an action of law, a suit in equity, or other proper proceeding . . ." Indeed the Act provides for equity jurisdiction. How-

ever, the Act is not applicable in this case. A thorough reading of the Act, and, in particular, sections 16-123-104 and 105, shows that its purpose is to protect individuals or certain groups from harassment and from discrimination in employment, use of accommodations, property and credit transactions, and voting. The suit bought by Mr. Harris does not correspond with the purposes of the Act. Therefore, he should not be allowed to use the Act to invoke chancery jurisdiction.

Obviously, the problem presented by *Walmsley* is of considerable concern. As mentioned, the issue of jurisdiction was not addressed by the parties in that case, nor was it recognized in our opinion. In retrospect, the jurisdictional defect should have been discovered and resolved. Ideally, the court would catch every defect in subject matter jurisdiction, whether raised by the parties or not. But the reality is that the court, despite its best efforts, has not always done so. This is particularly true considering the short time frame in which *Walmsley* was decided, as the court was besieged by election matters requiring expedited resolution. *See Ivy* v. *Republican Party*, 318 Ark. 50, 883 S.W.2d 805 (1994); *Christian Civic Action Committee* v. *McCuen*, 318 Ark. 241, 884 S.W.2d 605 (1994); *Walmsley* v. *McCuen, supra; Bailey* v. *McCuen*, 318 Ark. 277, 884 S.W.2d 938 (1994); *Lewis* v. *West*, 318 Ark. 334, 885 S.W.2d 663 (1994); *Page* v. *McCuen*, 318 Ark. 342, 884 S.W.2d 951 (1994); *Mertz* v. *States*, 318 Ark. 390, 885 S.W.2d 853 (1994); *Oliver* v. *Simons*, 318 Ark. 402, 885 S.W.2d 859 (1994); *Walker* v. *McCuen*, 318 Ark. 508, 886 S.W.2d 577 (1994); and *Wilson* v. *Cook*, 318 Ark. 520, 886 S.W.2d 593 (1994).

Attorneys have been cautioned by this court not to infer that jurisdiction is proper when the jurisdictional issue is not part of the court's ruling. *See, e.g. Connor* v. *Blackwood*, 176 Ark. 139, 2 S.W.2d 44 (1928). Whenever this court has had occasion to address the issue, the ruling has been unequivocal that chancery court simply has no jurisdiction in such election cases. We have also recognized that, rather than injunctive relief, mandamus is the proper remedy in such situations. *State* v. *Craighead County Bd. of Elections Comm'rs*, 300 Ark. 405, 779 S.W.2d 169 (1989). Even though the relief issued in this case was termed an injunction, the request was in the nature of a mandamus, as it was directed to a state official engaged in his ministerial duties. We

have steadfastly held that a court of equity cannot issue a mandamus. *Arkansas State Police Comm'n* v. *Davis,* 252 Ark. 137, 477 S.W.2d 852 (1972); *State* v. *Craighead County Bd. of Election Comm'rs, supra; Covell* v. *Bailey,* 296 Ark. 397, 757 S.W.2d 543 (1988); and *Harber* v. *Rhodes,* 248 Ark. 1188, 455 S.W.2d 926 (1970).

Whether the court has, without comment, allowed chancery jurisdiction to stand in certain cases in the past, the fact is that the jurisdictional defect should be recognized in this case. As we have said previously, we have not only the right, but the duty to raise this issue. *Arkansas State Employees Ins. Advisory Comm'n* v. *Estate of Manning, supra.* We cannot purposefully allow improper jurisdiction to be exercised, and our action and guidance now can serve to avoid such jurisdictional errors in the future.

In short, this court should conclude that equity is without jurisdiction, and dissolve the injunction issued by the chancellor, reverse her findings, and remand with directions that this matter be transferred to circuit court as issues still remain relating to counting and certifying the votes on the proposed amendment as well as canvassing of the vote by the Secretary of State.

Two wrongs do not make a right. We were wrong in accepting jurisdiction in *Walmsley, supra.* The majority now compounds our previous mistake by concluding that the Pulaski County Chancery Court had jurisdiction in this case.

I dissent.

DUDLEY and GLAZE, JJ., join this dissent.

TOM GLAZE, Associate Justice, dissenting. Once again, this court has exhibited its callous tendency to disregard the Arkansas voters' ability to cast a knowledgeable and intelligent vote on an issue. *See Christian Action Comm.* v. *McCuen,* 318 Ark. 241, 884 S.W.2d 605 (1994) (Hays and Glaze, JJ., dissenting). The court gives no rational justification for holding the voters' ballots cast for and against proposed amendment 2 should not be counted and certified, except that its decision in *Walmsley* v. *McCuen,* 318 Ark. 269, 885 S.W.2d 10 (1994), requires such drastic measures. *Walmsley* is not only wrong, it adopted a dangerous new legal principle, never previously espoused by this

court, which can be easily utilized by an election official to thwart the peoples' will at any future election. I will explain.

Relying on *Walmsley*, the majority court here holds that because the Secretary of State failed to publish proposed amendment 2 under the requirements of art. 19, § 22, the votes cast for and against the amendment should not be counted and canvassed. In fact, *Walmsley* represents the first and only Arkansas case where this court invalidated the voters' right to cast ballots on an issue in an election merely because an election official failed to comply with the law. Since 1887, this court has adhered to the rule of law that "the voice of the people is not to be rejected for a defect or want of notice, if they have in truth been called upon and have spoken." *Wheat* v. *Smith*, 50 Ark. 266, 7 S.W. 161 (1887).

In *Wurst* v. *Lowery*, 286 Ark. 474, 695 S.W.2d 378 (1985), this court rejected the plaintiffs' action in circuit court, requesting the court to enjoin the holding of a wet-dry election because of technical defects in the sponsors' petitions and a failure to publish notice of the election.[1] In refusing the plaintiffs' request to enjoin the election officials from counting the votes on the wet-dry issue because notice of the election had not been given the public, the *Wurst* court reasoned that there was no indication that the voters did not express themselves on the issue.

Arkansas law is well settled that our courts recognize that ordinarily election regulations are mandatory before the election and directory afterwards, *and the courts do not favor disfranchising a legal voter because of the misconduct of another person. Cowger & Stewart* v. *Mathis*, 255 Ark. 511, 501 S.W.2d 212 (1973) (emphasis added). This principle of law is best explained in *Orr* v. *Carpenter*, 222 Ark. 716, 262 S.W.2d 280 (1953), where the court stated the following:

> *To hold that all prescribed duties of election officers are mandatory, in the sense that their nonperformance shall vitiate the election, is to ingraft upon the law the very powers for mischief it was intended to prevent. If the mis-*

---

[1]Ark. Stat. Ann. § 48-801 (1977) required the county sheriff to give the public notice of the purpose and date of such election at least ten days before the holding of the election.

> take or inadvertence of the officer shall be fatal to the election, then his intentional wrong may so impress the ballot as to accomplish the defeat of a particular candidate or the disfranchisement of a party. And it is no answer to say that the offending officer may be punished by the criminal laws, for this punishment will not repair the injury done to those affected by his acts. *It is the duty of the courts to uphold the law by sustaining elections thereunder that have resulted in full and fair expression of the public will,* and, from the current of authority, the following may be stated as the approved rule: All provisions of the election law are mandatory, if enforcement is sought before election in a direct proceeding for that purpose; but after election all should be held directory only, in support of the result, unless of a character to affect an obstruction of the free and intelligent casting of the vote or to the ascertainment of the result, or unless the provision affects an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of the election, or that its omission shall render it void.

*Id.* at 718 (emphasis added). *See also Rogers* v. *Mason,* 246 Ark. 1, 436 S.W.2d 827 (1969).

As mentioned previously, *Walmsley* is a dangerous and erroneous precedent which will permit Arkansas voters to be disfranchised merely because an election official, like the Secretary of State in this case, fails to comply with laws designed to inform them more fully on a ballot issue. If elections or ballot issues can be respectively enjoined or removed because an election officer fails to comply with election laws or ballot procedures, then political mischief by election officials can be expected from time to time. The peoples' right to vote should not depend upon an official's whimsey, negligence or design in failing to comply with the law. When an official does not perform his duty under the law, mandamus is available as a legal remedy to enforce his compliance. Regardless, Arkansas courts, until *Walmsley*, had never vitiated votes or election results in situations where voters had not been deprived of the constitutional right to express themselves in the election even though an irregularity by an election official occurred in conducting the election. *See Rogers,* 246 Ark. at 4, 436 S.W.2d at 829.

Here, appellee had the burden under established law to show that the Secretary of State's failure to comply with the law in some manner thwarted Arkansas voters from expressing themselves concerning the proposed constitutional amendment 2 issue. He made no effort to meet that burden. The majority court's decision expresses its sanctimonious opinion that Arkansas voters are unable to understand and vote on a ballot issue merely because some election official failed to publish that issue in a newspaper months in advance of the election. How preposterous! That is not, and should not be, the law. The voters' ballots in this case should be counted, canvassed and certified, and *Walmsley* should be promptly overruled before that holding can be misused again to prevent Arkansas voters from expressing their will.

In conclusion, I add that Chief Justice Holt's dissenting opinion, stating chancery court has no jurisdiction in this case, is exactly correct. There is little to add, but I would say that, until this court steadfastly requires such election matters be in one court or another, these jurisdictional issues will continue to abound. This court in *Catlett* v. *Republican Party of Arkansas*, 242 Ark. 283, 413 S.W.2d 651 (1967), intended to resolve this jurisdictional problem by making it clear that election matters were to be filed in and decided by circuit court. More recently, in *Ivy* v. *Republican Party*, 318 Ark. 50, 883 S.W.2d 805 (1994), and *State* v. *Craighead County Bd. of Election Comm'rs*, 300 Ark. 405, 779 S.W.2d 169 (1989), this court underscored that election matters must be decided in circuit court when it held a person must seek declaratory relief and mandamus (an at-law remedy) when challenging a candidate's eligibility in having his name printed on the election ballot. *See also Cummings* v. *Washington County Election Comm'n*, 291 Ark. 354, 724 S.W.2d 486 (1987).

I point out here that, if appellee had been genuinely concerned about proposed constitutional amendment 2 being published by the Secretary of State, he could have readily sought mandamus relief to compel that publication. Under our case law, such action clearly lies within the jurisdiction of circuit court. Instead, appellee sought to invoke chancery court jurisdiction to request that the proposed amendment be omitted from the ballots, or alternatively, the votes cast for the amendment not be counted or canvassed. As this court said in the *Craighead County*

*Bd. of Election Comm'rs* case, election matters must be promptly considered and mandamus is the proper remedy to obtain prompt judicial action. To allow persons, such as appellee here, to wait until the last minute before an election to enjoin the counting and canvassing of ballots and election returns is unfair to the many Arkansas voters who cast their votes on the constitutional issue.

HOLT, C.J., joins this dissent.